STATE v. FRED JOHNSON.

(Filed 3 May, 1967.)

**1. Homicide § 18—**

Where defendant in a homicide prosecution pleads self-defense, he is entitled to show the character of the deceased as a violent and dangerous man, and may testify as to incidents of violence in altercations between the deceased and himself, and may also testify as to specific acts of violence which occurred in defendant's presence or of which he had knowledge in altercations between the deceased and third parties, for the purpose of explaining and establishing defendant's reasonable apprehension when deceased advanced toward him.

**2. Homicide § 12; Criminal Law § 33—**

In this homicide prosecution, the evidence tended to show that deceased was fatally shot by defendant when deceased was some eight feet from

defendant, defendant contending that deceased was reaching for a pistol in the pocket of his trousers. *Held:* Testimony tending to show that deceased had suffered an injury while in service and was a partially disabled serviceman is immaterial and irrelevant, there being no contention of any physical combat between them, and such testimony is prejudicial as tending to incite the sympathy of the jury.

**3. Homicide § 18—**

Where, in support of defendant's plea of self-defense, he introduces evidence of the violent and dangerous character of the deceased, the State is limited in rebuttal to the general reputation of deceased for peace and quiet, and may not elicit evidence of the general good character of the deceased.

APPEAL by defendant from *Campbell, J.,* October 1966 Regular Criminal Session of MADISON.

Defendant was tried on bill of indictment charging first degree murder of one Travis Ray. He entered a plea of not guilty.

The evidence tended to show the following: Defendant was a tenant of Travis Ray and lived a short distance from Ray's house, on land owned by Ray. Around 8:00 o'clock A.M. on 27 August 1966 defendant and Ray were together at Ray's home dividing the proceeds received from sale of tomatoes. Very soon thereafter, defendant and his wife rode with one Jimmie Metcalf into the town of Marshall, where defendant visited a bank. On the return trip they stopped at a general store, where defendant purchased, among other things, shells for a 30-06 rifle. They then returned to defendant's home, where Metcalf left defendant and his wife. Around 1:00 o'clock P.M. Travis Ray stopped his truck in front of and across the road from defendant's home. One Kenneth Shelton drove his car up and parked behind Ray's truck, and the two stood at the car talking for several minutes. Ray then left Shelton and started up the path to defendant's home. Defendant was sitting on his front porch with his feet on the top step and a 30-06 rifle across his lap. As Ray approached the house, there was some conversation between him and defendant. When he was within about eight feet of the house, defendant shot him, then stood up, reloaded, and shot Ray two more times while he was lying on the ground.

Sheriff E. Y. Ponder testified that when he first arrived at defendant's home he observed the body of Travis Ray lying some eight feet down the path from the front porch. Sheriff Ponder stated: "In the ruler pocket on the trousers leg of the trousers the deceased was wearing, I found a Smith & Wesson pistol, with the barrel sticking down in it."

Kenneth Shelton, the only eyewitness, testified that as Ray approached the house he asked defendant why he had not started

picking tomatoes, and the defendant replied that he would pick tomatoes when he got good and ready. Ray then told defendant that he had brought people up to pick tomatoes, whereupon defendant replied that no one was going to pick tomatoes and, at this point, fired at Ray, and he, Shelton, ran.

Jimmie Metcalf, Travis Ray's son-in-law, testified concerning his trip to Marshall with the defendant, and stated that while they were driving to Marshall the defendant told him that he had gone to Ray's house that morning with the intention of killing Ray.

Defendant testified in his own behalf. He admitted that he shot and killed Ray, and testified to events substantially as presented by the State, except he denied making any statement to Metcalf that he intended to kill the deceased, and stated his version of the events immediately before the shooting, as follows:

". . . . And when he come into the walkway, up in the road, well, he come on about halfway from the road to me, and I noticed he had a gun. It was a pistol. As to where it was with reference to his right hand, he had it down on this side, on his right leg. He had a-hold of it with the handle. He had the handle in his right hand as he walked up towards me. Well, he walked about halfway up there to the steps where I was at from the road down there and he said to me, he said, 'Ain't you up a-picking no tomatoes yet?' He just asked me this question. He said, 'Ain't you up a-picking no tomatoes yet?' and I said, 'No, we are getting ready to.' He just kept walking on up to me and he said, 'If you and your wife don't get them g . . d . . . tomatoes picked, I'm going to kill you both and burn the house down on you.' After that, I was sitting there on this position and he walked another step or two from where he had said that, and I said, 'Travis, you'd better stop.' Then he made a move—move to bring this pistol up, and I fired. I fired the first shot a-sitting down across my lap. There were two more shots. I got on my feet before I fired the second and third shots. I fired the second and third shots because he was a-moving around there with his hand, his right hand; he was still a-trying to move his gun there. He was trying to move this revolver. I was protecting myself.

"I shot these three shots at Travis Ray because he had come there and threatened my life and my wife's, and I had no other way out. He was a-forcing me and I knew he was a dangerous man."

At this point defendant testified that on the evening prior to the shooting Ray had pulled him through a store two or three times, punching him in the ribs with a pistol. As defendant began further testimony concerning an incident involving statements made by Ray's wife about his dangerous and violent actions, the State objected and the Judge heard testimony from the defendant in the absence of the jury. Defendant testified to several instances concerning the violent and dangerous character of Travis Ray, which are summarized as follows: (1) An occasion when the wife of the deceased came to defendant's home stating the deceased had beat her; (2) an occasion when defendant saw Ray's wife "going through the field and her children a-running with her, and him a-shooting at them and her a-running for her life, a-going to her daddy's and mother's with them"; (3) an occasion when the defendant and his wife were riding with Ray in his new automobile and another car spun its tires and threw gravel on Ray's automobile. According to defendant, the deceased put a pistol in his wife's ribs and forced her to chase the other car for several miles, Ray having his foot on the accelerator and his wife applying the brakes so as to cause the brakes to burn out. Whereupon the court made the following ruling: "Let the record show that the foregoing evidence was elicited in the absence of the jury, the court sustained the objection to the testimony, but advised counsel that he would let the witness testify as to his own experience with the deceased; and to that extent the court will permit testimony to be introduced before the jury." Thereafter, defendant testified to one incident where deceased had shot a pistol past defendant's face and into the house where they were visiting.

The jury returned a verdict of guilty of murder in the second degree, and from judgment entered thereon defendant appealed.

*Attorney General Bruton and Staff Attorney Wilson B. Partin, Jr., for the State.*
*A. E. Leake for defendant.*

BRANCH, J. Defendant pleaded and offered evidence of self-defense. He contends that the trial judge erred in excluding testimony concerning specific incidents offered to show defendant was a violent and dangerous fighting man.

It is generally recognized in this jurisdiction that in a prosecution for homicide, where defendant pleads and offers evidence of self-defense, evidence of the character of deceased as a violent and dangerous fighting man is admissible if such character was known

to defendant. *State v. Morgan*, 245 N.C. 215, 95 S.E. 2d 507. In the instant case the court ruled that defendant could testify only as to his own experiences with the deceased. Thus we must decide if defendant may testify to specific acts of violence which occurred in his presence or of which he had knowledge prior to the homicide.

In the case of *Mortimore v. State*, 24 Wyo. 452, 161 P. 766, the Court stated: "(T)hat former specific acts of violence of the deceased, showing his brutal or dangerous disposition and character, known to the defendant, that is, acts committed in his presence, or communicated to him before the homicide, are admissible in evidence, not for the purpose, primarily, of showing the deceased's character, but to explain the defendant's motive and what he might reasonably have apprehended as to the danger."

Considering the same question in *Mendez v. State*, 27 Ariz. 82, 229 P. 1032, the Court was of the opinion that where the facts show a *prima facie* case of self-defense, the accused should generally be permitted to introduce evidence of specific acts of violence by the deceased toward third persons within his own knowledge or coming under his own observation.

Also, the Delaware Court held in *State v. Gordon*, 37 Del. 219, 181 Atl. 361, where defendant killed one who assaulted him with a knife, and it was held that he should have been allowed to testify to specific instances, known to him either personally or by hearsay, of affrays in which the deceased was the aggressor and had used a knife, the court said: "The state of mind of the accused is material. The jury is to pass upon his belief that the deceased was about to attack him. Without doubt, the reputation of the deceased for violence, known to the accused, is admissible; and there seems to be no substantial reason why the belief of the prisoner should not be evidenced by knowledge of specific acts of violence, as well as by knowledge of general reputation for violence, subject, of course, to exclusion in a proper case for remoteness."

In the case of *Nance v. Fike*, 244 N.C. 368, 93 S.E. 2d 443, the Court, speaking through Bobbitt, J., stated: "Ordinarily, evidence of prior threats and of incidents of violence on prior unrelated occasions are competent only if the defendant was present or had knowledge thereof prior to the alleged assault. *S. v. Blackwell*, 162 N.C. 672, 78 S.E. 316."

The rationale of this rule is that a jury should, as far as is possible, be placed in defendant's situation and possess the same knowledge of danger and the same necessity for action, in order to decide if defendant acted under reasonable apprehension of danger to his person or his life. We know of no better way to impart the knowl-

edge of fear or apprehension on the part of defendant than by giving the jury the benefit of specific incidents tending to show the dangerous and violent character of the deceased. It remains in the province of the jury to decide whether the incidents occurred or whether defendant's apprehension was a reasonable one. Here, it was error for the trial judge to limit defendant's testimony, *as a matter of law*, to his own experiences with the deceased. He should have been allowed to relate specific acts of violence which occurred when he was present or of which he had knowledge prior to the homicide.

Defendant contends the trial court erred in admitting evidence that deceased had a service-connected disability as a result of military service in World War II. The following questions were propounded and answered over defendant's objection:

> "Q.  He was injured in the War, was he not, in some way?
> A.  Yes, he told me, I believe, in his hip, or somewheres something had struck him sometime.
> Q.  And he was classed as a disabled Veteran or partially disabled on account of that injury that he received in the Service, was he not?"

These questions were not material or relevant. In the case of *Holman v. State*, 97 Okla. Cr. R. 279, 262 P. 2d 456, the Court stated: "Likewise the physical condition of Holman attempted to be shown by Bayless Holman, son of the defendant, was immaterial to the issues herein involved; regardless of his condition he was in such shape he could shoot accurately."

The following is found in *Jones v. State*, 153 Tex. Cr. R. 345, 220 S.W. 2d 156: "In 22 Tex. Jur. p. 698, sec. 162, it is said: 'But where the homicide was committed with a firearm, this character of evidence (relative size and strength of appellant and deceased) usually throws no light on the transaction; in so far as it is germane, however, it may be received,' citing *Lundy v. State*, 59 Tex. Cr. R. 131, 127 S.W. 1032."

And in *Wright v. State*, 162 Miss. 592, 139 So. 846: "In the present case, there was no evidence whatever to show a physical combat between appellant and the deceased immediately before the homicide. Appellant shot the deceased at a time when they were several feet apart. . . . The court, therefore, committed no error in ruling out evidence offered by appellant to show that the deceased was a more powerful man. . . ."

Here, the evidence shows that deceased was shot when he and defendant were about eight feet apart. There is no evidence of phys-

ical combat or even the actual threat thereof. The injury referred to was a *hip* injury, and in no way interfered with deceased or so incapacitated him as to prevent the use of his weapon. The immateriality and irrelevancy of these questions, standing alone, would probably not seriously prejudice the defendant, but when the solicitor is twice allowed, over defendant's objection, to show the deceased was injured while serving his country, the prejudice to defendant becomes apparent.

*Stanley v. Lumber Co.*, 184 N.C. 302, 114 S.E. 385, is a civil action wherein plaintiff sought recovery of damages for personal injuries. The court, holding that it was error to admit plaintiff's certificate of discharge from the U. S. Army during the World War, among other things, said: "It is clear that the major part of the certificate was used for the purpose of appealing to the sympathy of the jury." In *Watson v. State,* 48 S.W. 2d 623, an appeal from a conviction of murder, the court said: "We confess ourselves unable to see any right on the part of the State to prove that deceased was hurt in Belgium during the World War and that he had been operated upon unsuccessfully, and that he was sickly and unable to work at the time he was killed. Nothing in such proof would aid the state in legally establishing the guilt of the accused, or in properly rebutting any defensive theory advanced."

The admission of this immaterial and irrelevant evidence could only serve to excite sympathy for the deceased and prejudice against the defendant.

The State recalled Clarence Dean Cutshall, who, in response to the solicitor's questions concerning the reputation of the deceased, testified in part: "I do not exactly know his reputation. . . . Well, just as far as I know, he was a good man." The court overruled defendant's objection and motion to strike as to this testimony. Also, the State recalled witness Kenneth Shelton, who, over defendant's objection, testified in part as follows: "Q. Do you know his general reputation in the community, that is, what people said about him? A. Yes, I know his general reputation in the community. I have never heard of him bothering anybody. I have never heard of anyone speak of his being a dangerous or violent man."

In the case of *State v. Champion,* 222 N.C. 160, 22 S.E. 2d 232, where defendant in support of his plea of self-defense testified that deceased was a "dangerous and violent" man, the State in cross examining defendant's witnesses, and over the objection of defendant, elicited evidence of the general good character of the deceased. The court held that the evidence so elicited by the State was incompetent and its admission constituted prejudicial error, entitling de-

fendant to a new trial. The Court held that the State, in rebuttal, was *"limited to the general reputation of the defendant for peace and quiet."* (Emphasis added) In the instant case, the evidence offered goes beyond this limit.

The errors discussed when considered with the total circumstances weighed too heavily on defendant, and there must be a new trial.

Other exceptions pressed for error need not be considered as they may not recur on retrial.

New trial.