FRANKLIN L. RUSH (SUBSTITUTED AS PLAINTIFF IN LIEU OF MATTHEW CROSS) v. JAMES W. BECKWITH

No. 97

(Filed 23 August 1977)

1. **Cancellation and Rescission of Instruments § 11; Fraud § 13— rescission of deeds—threats by defendant—instructions proper**

   In an action to rescind three deeds allegedly procured through fraud, undue influence and duress, the evidence supported the court's instruction that there was evidence tending to show that at the time of signing of the deeds "or at some earlier time on the same day" defendant told the aged property owner that if he did not sign the deeds defendant would have his wife put in an asylum and would turn him out to root like a hog.

2. **Cancellation and Rescission of Instruments § 9.1; Fraud § 11— rescission of deeds—mental and physical condition of property owners—defendant's behavior—evidence properly admitted**

   In an action to rescind three deeds allegedly procured through fraud, undue influence and duress, the trial court did not err in admitting evidence tending to show: (1) the mental and physical condition of the aged landowners before and after the execution of the deeds, since the condition of the landowners bore directly upon their ability to withstand the unfair tactics, threats or blandishments of a stronger will, and the mental condition of the landowner wife also bore upon defendant's alleged threat to place her in an asylum and the probable reaction of the landowner husband to defendant's alleged threat to "put her away"; (2) that defendant gave the landowners no assistance from one year after execution of the deeds, since that evidence reasonably tended to show the probability that defendant never intended to support and care for the landowners as he had promised to do in exchange for the deeds.

ON plaintiff's petition for discretionary review of the unpublished opinion of the Court of Appeals (filed 21 July 1976), which reversed the judgment of *Bailey, J.*, at the 7 July 1975 session of the Superior Court of WAKE. This case was docketed and argued as Case No. 154 at the Fall Term 1976.

Matthew Cross (Cross) and wife, Maggie Cross, the original plaintiffs, brought this action on 14 November 1969 to rescind three deeds dated 5 June 1966 by which they purported to convey three tracts of land containing approximately 44.48 acres to defendant James W. Beckwith. Plaintiffs allege that defendant procured the deeds through fraud, undue influence and duress. The first trial, conducted at the 14 February 1972 session, resulted in a judgment for plaintiffs and defendant appealed. In April 1972, during the pendency of that appeal, Maggie died testate, leaving all her property to Cross. Thereafter the Court of Appeals ordered a new trial. *Cross v. Beckwith*, 16 N.C. App. 361, 192 S.E. 2d 64 (1972).

At the second trial plaintiff Cross again prevailed. The jury found that the execution of the three deeds was "procured by duress exercised by James W. Beckwith over Matthew Cross, as alleged in the complaint." Upon defendant's appeal, the Court of Appeals again ordered a new trial, and it is that unpublished decision which we now review.

Cross died testate on 30 July 1976, nine days after the decision of the Court of Appeals was filed. In his will, which was probated on 21 December 1976, Cross left his entire estate to the Reverend Franklin L. Rush (Rush). In this Court, Rush moved that he be substituted for Cross as the party plaintiff in this action, and this motion was allowed.

At the second trial Cross was present in court but incapable of testifying. Accordingly, Judge Bailey permitted Cross to testify by way of a transcript of his testimony in a former trial.

Evidence for plaintiff tended to show the following facts:

In 1966 Maggie and Matthew Cross, an elderly black couple, were living on their small farm in Wake County, which Matthew had formerly farmed by himself. He was then receiving income from 3.18 acres of tobacco, three dilapidated "rental units," and social security. Maggie, a retired school teacher, was suffering from high blood pressure, diabetes, and hardening of the arteries. In 1964 she had a stroke; in 1965 she had another. Thereafter Maggie was partially paralyzed and her memory was impaired. She could no longer handle the Crosses' business affairs. Her sister, Beulah Clegg, and her niece, Annie Lawrence, helped them with their business affairs "over a number of years." They also provided the Crosses with transportation, cleaned the home, and did their grocery shopping. On 15 April 1964 Matthew and Maggie deeded to Beulah Clegg Maggie's interest in 32 acres of land which she and Beulah had inherited from their mother. Sometime thereafter Beulah and Annie quit handling the Crosses' affairs and did nothing for Matthew and Maggie unless they were asked.

At the time of the first trial in 1972 Cross was "some better than 80 years old." His testimony tended to show that he had not had "much schooling" and could neither read nor write. Since the death of Maggie's sister, Beulah, Rush had helped him with his business affairs and defendant Beckwith, a cousin of Maggie's, had never assisted them in any way or provided them with any support, medical attention or other essentials.

Rush (Cross) v. Beckwith

Cross's testimony with reference to the execution of the deeds in suit is set out verbatim below:

"A. . . . [Beckwith] Brought a man in there on Sunday morning there while myself and my wife was looking at the radio, there when she got so she couldn't walk up to the church. . . . Mr. Beckwith came to see me with this man who I spoke with.

Q. Well, Matthew, tell in your own words what happened when they came to your house?

A. When he came to the house in there, the lawyer set down to writing on the paper and so then handed it to me and told me if I . . . . Why he was going to take my wife and take her to an asylum and put me out for hogs to root, something like that.

Q. Left you out for what?

A. Out to root like a hog, something like that.

Q. Did Beckwith say that to you?

A. Yes, sir. I did not ask James Beckwith to come to my house that day. I didn't know he was coming. I did not ask for any lawyer to come to my house that day. I did not request anyone to come to see me that day. I did have a lawyer at that time. I had Mr. Harris. He had been handling my legal affairs up to then. Mr. Beckwith did not make any statement to me about the purpose of his visit.

Q. He just handed you the paper to sign?

A. Yes. I did not know what the papers were that he handed to me. He did not explain what the papers were. He did not read them to me. I couldn't read anyhow. I just signed the papers. She could not read. Maggie signed the papers.

Q. And you signed them before or after Maggie signed them?

A. Well, I signed them before then. The reason I did—spoke about taking her away. Done spoke about taking my wife to an asylum and I felt like less a man and let my wife be take to an asylum. Didn't have any business in an asylum."

Cross also testified that at the time he signed the paper which Beckwith brought him, he did not intend to convey his property to him, and that he did not give defendant the authority to look after his affairs at any time. Cross remembered that in February 1966 Mr. Robert Cotten had drawn a will for him and Maggie but he insisted that he had not employed him. He could not recall the contents of the will but thought the beneficiaries named were "next of kin."

Rush's testimony tended to show the following facts:

Prior to 1968 Rush paid monthly visits to Matthew and Maggie Cross, who were members of his church. Matthew was a trustee and Maggie, the "treasurer-administrator of kindness." In 1968 Rush "observed them as individuals who obviously were neglected and needed some attention." The condition of their home was "undesirable," and at times they had no fuel and no food. Maggie, a diabetic, was not receiving proper medication. Therefore, when Maggie asked him to "provide some assistance," he agreed. He found hospital insurance policies which had lapsed because the premiums had not been paid and uncashed social security checks which had accumulated over a period of time. In 1968 and 1969 Rush was handling all their business transactions. He collected their rents, paid their bills, purchased their food and medicine, carried them to the doctor and hospital, and deposited their checks. At that time no one else was doing anything for the Crosses. Although he saw defendant on three or four occasions Rush knows of nothing he did for the Crosses during 1968, 1969, 1970, or thereafter.

In 1968 Cross told Rush that the deeds in suit were executed under the following circumstances: On a Sunday morning when he and Maggie were listening to the radio, defendant, along with some man, came in and asked him to sign papers; that Beckwith said if he did not sign he would be placed in a house "in the edge of the woods" and Maggie would be "put away" in a "crazy house"; that "he would have been less than a man to refuse" under these conditions; so he signed, but he did not know what he was signing.

"In 1970 or thereabouts" the Crosses had become physically unable to care for themselves, and Rush was required to make daily visits to their home. Neither Matthew nor Maggie was then capable of signing checks or reading, and no one but Rush was providing any assistance whatever for them. In consequence they requested him to contact their attorney, Mr. W. C. Harris, "and make it official that [Rush] would care for their affairs." After consulting with Annie Lawrence, who urged him to comply with the Crosses' request, he took them to Mr. Harris's office. In consequence Mr. Harris drew a will which was "fixed so that if Matthew died prior to Maggie, all of the property would in fact go to her and vice versa, and if [Rush] lived longer than either, for [his] services, the remainder . . . would go to [him]."

At the time of the second trial, Cross was in a nursing home, where his expenses exceeded his income, and Rush was spending $160.00 a month of his own money to maintain him.

Rush testified on cross-examination that he would receive a financial benefit from this lawsuit only to the extent that Cross's expenses for the remainder of his life did not exceed the value of Cross's property.

At the close of plaintiff's evidence, defendant's motion for a directed verdict was denied and he offered the evidence summarized below.

On 6 February 1966 James Beckwith had been living in Baltimore for 26 years. On that date he received a telephone call from his relative, Matthew Cross. Without explaining himself, Cross asked Beckwith to come down to Holly Springs. Prior to this time Beckwith had occasionally visited his parents there. On 9 February he went to the Cross home. He found the Crosses without heat and with bursted water pipes. He had the pipes fixed, repaired the heat, and made other minor improvements.

Beckwith testified, "[After that,] Mathie and Maggie asked me to take them down to Fuquay Springs. . . . When we got to Fuquay, they asked me to take them by lawyer Cotten's office. This was on the 10th of February, 1966. They did not tell me the reason they wanted me to go to lawyer Cotten's." Once there, the Crosses asked Cotten to prepare four sets of documents: two wills, each providing that the property of the first Cross to die would pass to the survivor and, upon the death of the survivor, the property would go to Beckwith; a letter, addressed to Beckwith and signed by Matthew and Maggie, naming him their "trustee"; a contract between John Smart and Matthew Cross for the rental of Cross's tobacco allotment; and three deeds conveying certain properties to Beckwith. All the documents were prepared except for the deeds which were delayed, because the description of the property was not then available.

Beckwith returned to Baltimore. However, he returned to North Carolina every other week to check with the Crosses. About a month later, the Crosses gave Beckwith their deeds to the property in suit and they "asked me to have them transferred over into my name. . . . When I got the deeds, I kept them for a couple of weeks and they specified to me, 'Now I don't want you to use lawyer Cotten to have those deeds transferred. I want you to get an attorney that you don't know anything about or we don't know anything about.' " Beckwith secured the services of Mr. Keeter and Mr. Alton Kornegay of Raleigh.

Beckwith had the property surveyed and when the deeds were ready he told the Crosses. Two weeks later, on 5 June 1966, he came

down from Baltimore to complete the conveyance. He arrived at the Crosses' two hours before Kornegay and his legal secretary, Mrs. Ruth Hayner. According to Beckwith he introduced Kornegay, who explained to the Crosses the purpose of the documents and in general made sure that Matthew and Maggie knew what they were doing. No threats were made, and the deeds were signed. Maggie and Matthew wrote Kornegay a check for $385, and "in return I gave Mathie and Maggie $300 in cash and a $150 check. They were deposited in the bank the next day." The bookkeeper of the Fidelity Bank in Fuquay testified that Matthew and Maggie Cross deposited $200 in cash and a $150 check drawn on a Baltimore bank in their account on 6 June 1966. Mrs. Hayner corroborated all the essential details of Beckwith's testimony concerning the Sunday meeting, and Cotten corroborated his testimony with reference to the events which occurred in his law office on or around 10 February 1966.

Beckwith testified that he had promised to look after Matthew and Maggie, and he did "just that" until sometime in September 1968 when Matthew told him he was "going to try to get the land back" and Mr. Harris had told them not to accept anything else from him. Beckwith also testified that "long before September 1968" Mr. Harris had requested him "on behalf of Matthew and Maggie to reconvey this property to them."

*Randolph L. Worth and W. C. Harris, Jr., for plaintiff appellant.*

*Broughton, Broughton, McConnell & Boxley, P.A., by Charles P. Wilkins and Gregory B. Crampton for defendant appellee.*

SHARP, Chief Justice.

[1]  Plaintiff's appeal presents only the question whether the Court of Appeals erred in holding that the trial judge, in his charge to the jury, misstated the evidence on a material fact to the prejudice of defendant.

The challenged instruction is contained within the bracketed portion of the charge set out below:

"Now, there is evidence in this case, ladies and gentlemen, that in substance tends to show — what the evidence does show is for you to say always — but in substance the evidence tends to show that on the 6th of June, 1966, Mr. Beckwith came to the home of the Crosses on a Sunday morning while they were listening to church on the radio; that after he had been there for some substantial period of

time, I recall his evidence to have been an hour and a half to two hours, but again be guided by your own recollection, a Mr. Kornegay, accompanied by a Mrs. a Miss Ruth Hayner, who was at that time Mr. Kornegay's secretary, and Mr. Kornegay was at that time an attorney at law, that at that time Mr. Kornegay produced three deeds; [that Mr. Beckwith either then or at an earlier time on this same day had told Mr. Cross that if he did not sign the deeds that he would have his wife put in an asylum and would turn him out to root like a hog. Mr. Cross has testified that he signed the document because he didn't think his wife belonged in an asylum; that he knew she was sick; that he felt like he would be less of a man if he permitted that to happen.]"

In due time counsel for defendant objected to the bracketed portion of the foregoing instruction on the ground that there was no evidence tending to show that Beckwith had made any threats to Cross *prior to* the time Mr. Kornegay produced the deeds, and he requested him to correct his charge in this respect. The request was denied. Judge Bailey, however, again instructed the jury "to consider the evidence only as they recalled it and to disregard any recitation of evidence that conflicted with their own memories."

Since the testimony of Mrs. Hayner, who was the legal secretary who typed the deeds and also the notary public before whom they were acknowledged, contains no reference to any threats by any person at the time of their execution and implicitly negates any such threats, defendant contends that the judge should have required the jury to find that if no threats were made in Mrs. Hayner's presence none were made at all. Such an instruction would, of course, have forced the jury to reject the testimony of either Mrs. Hayner or Cross, whereas the instruction given permitted the jury to avoid this dilemma. Thus defendant contends the judge's asserted misstatement was not harmless because it would reasonably have affected the outcome of the trial.

Were we to adopt defendant's premise we would also adopt his conclusion. *See In re Taylor*, 260 N.C. 232, 132 S.E. 2d 488 (1963). *See also State v. McClain*, 282 N.C. 396, 400, 193 S.E. 2d 113, 115 (1972). However, in this case, the record evidence is reasonably conducive to the interpretation that the threats, if made, were made before Mr. Kornegay and Mrs. Hayner arrived at the Crosses' home.

Defendant testified that he had been at the Cross home on 5 June 1966 "for maybe an hour, two hours, something like that," before Kornegay and Mrs. Hayner arrived. The record does not

disclose what he did or might have said to the Crosses during this time. The testimony of Matthew Cross was confused. The old man frequently expressed uncertainty as to times and dates. His testimony is clear and positive only as to these things: (1) Beckwith arrived at his home on the Sunday morning the deeds were signed at a time when he and his wife were listening to a church service on the radio; (2) Beckwith threatened to put Maggie in the asylum and turn him out to root like a hog if he did not sign "the papers," and (3) he signed them only because Beckwith made these threats. Thus, his testimony, if the jury found it to be credible, would support a finding that Beckwith threatened Cross either at the time of signing or at some earlier time on the same day. Since Beckwith arrived from one to two hours before Mrs. Hayner, who testified that no threats were made while she was present, the evidence reasonably supports an inference that the threats, if made, were made before she arrived. We hold that there was no error in the judge's recapitulation of the evidence and that the Court of Appeals was in error in ordering a third trial.

[2] Defendant brings forward for review the nine assignments of error discussed in his brief filed in the Court of Appeals. By assignments of error Nos. 1, 4, 5, 10 and 12 he challenges as irrelevant and prejudicial the admission of evidence tending to show the physical and mental condition of Maggie Cross, whose death in 1972 removed her as a party to the action; evidence as to the Crosses' mental and physical condition after 5 June 1966; and evidence that Beckwith gave them no assistance after 1967.

Evidence "is competent and relevant if it is one of the circumstances surrounding the parties, and necessary to be known to properly understand their conduct or motives, or to weigh the reasonableness of their contentions." *Bank v. Stack*, 179 N.C. 514, 516, 103 S.E. 67 (1920). *Accord, State v. Arnold*, 284 N.C. 41, 199 S.E. 2d 423 (1973). "Testimony is relevant if it reasonably tends to establish the probability or improbability of a fact in issue." State *ex rel. Freeman v. Ponder*, 234 N.C. 294, 304, 67 S.E. 2d 292, 300 (1951). Applying these principles, we hold that the challenged evidence was properly admitted.

The two issues submitted to the jury in this case were whether defendant procured Cross's signature to the three deeds by (1) fraud and undue influence or (2) by duress. Ordinarily, the complete circumstances surrounding a transaction in which these particular wrongs are alleged are relevant upon the right of a party to avoid the transaction. Thus, the mental and physical condition of each of

the Crosses on 5 June 1966 bore directly upon their ability to withstand the unfair tactics, threats, or blandishments of a stronger will. *See Link v. Link*, 278 N.C. 181, 179 S.E. 2d 697 (1971). Maggie's mental condition also bore upon Beckwith's alleged threat to place her in an asylum, and the probable reaction of a devoted, albeit ignorant and senile, husband to the threat "to put her away."

Likewise, evidence which tended to show that after 1966 defendant did not assist or care for the Crosses despite their obvious need was relevant to the inquiry whether he obtained their deeds by fraud, undue influence, or duress. "Subsequent acts and conduct are competent on the issue of original intent and purpose." *Early v. Eley*, 243 N.C. 695, 701, 91 S.E. 2d 919, 923 (1956). One of the allegations upon which the original plaintiffs based their right to rescission was that defendant, knowing their feeble physical condition and mental deterioration, had procured their signatures to the deeds by fraudulently promising he would rent their land for them, look after all their affairs as their trustee, and care for them the remainder of their lives.

Beckwith testified that on 10 February 1966, when he and the Crosses were negotiating, he promised to "assist them in any and everything that they couldn't do. . . . I promised to look after them, and I did just that, up to '68. . . ." He also testified that his promise was the consideration which supported the conveyances to him. Cross's testimony that defendant never rendered any assistance to him and Maggie, and defendant's testimony that he never provided any assistance or care after 1967, "reasonably tends to establish the probability" that defendant, a resident of Baltimore, never intended to support, maintain, and care for the Crosses, his elderly collateral kin who lived 300 miles from Baltimore and who, in natural course, would need infinite personal care and medical attention for the remainder of their lives.

As defendant points out, the evidence tending to show the sad plight of this disabled elderly couple, whose assets — the fruits of an industrious life — were sufficient to care for them adequately until the end if properly administered, was likely to touch the hearts of the jurors. However, "relevant evidence will not be excluded simply because it may tend to prejudice the opponent or excite sympathy for the cause of the party who offers it." *State v. Wall*, 243 N.C. 238, 242, 90 S.E. 2d 383, 386 (1955). Finally, since it was not error to admit this evidence, it was certainly not error for the judge to mention it in his recapitulation.

Defendant's assignments Nos. 1, 4, 5, 10 and 12 are overruled.

By assignment No. 3 defendant asserts that the trial judge abused his discretion in permitting plaintiff's counsel to ask Cross a number of leading questions. Counsel concedes, however, that it is within the sound discretion of the trial judge to determine when counsel shall be permitted to ask leading questions. Ordinarily the court will permit leading questions when the witness "has difficulty in understanding the question because of immaturity, age, infirmity or ignorance." *State v. Greene*, 285 N.C. 482, 492, 206 S.E. 2d 229, 236 (1974). On this record we find no abuse of judicial discretion in the rulings here challenged. Assignment of error No. 3 is overruled.

Of defendant's three remaining assignments of error, the two which relate to the charge (Nos. 13 and 14) are entirely without merit and require no discussion. The other (No. 6) challenges three questions on cross-examination which were intended to elicit from defendant an admission that he knew from a deposition which Maggie had made that she had corroborated the testimony of Cross and that he likewise knew in 1969 or 1970 that the *status of her property* was "driving her crazy." These questions, as framed, assumed facts not supported by any evidence in the case and were, therefore, improper. The judge erred in not sustaining defendant's objections to them. However, in his answers defendant himself pointed out the inherent defect in the questions and emphatically denied the implications they contained. We cannot believe that these questions had any appreciable impact on the trial or that there is a reasonable probability that they influenced the verdict. The error, therefore, was harmless. *Wilson v. Suncrest Lumber Co.*, 186 N.C. 56, 118 S.E. 797 (1923).

On the evidence a jury might have decided this case "either way." However, two juries have decided it the same way. In the second trial we find no error of law entitling defendant to a third trial. Accordingly, the decision of the Court of Appeals is reversed. The cause will be remanded to the Superior Court of Wake County with directions to enter judgment for the substitute plaintiff upon the verdict rendered.

Reversed and remanded.