STATE OF NORTH CAROLINA v. PAUL WILSON BARE

No. 533A82

(Filed 9 August 1983)

1. **Criminal Law § 117.3— State's witness—failure to give special instruction regarding witness's testimony proper**

   In a prosecution for murder, the trial court did not err in refusing defendant's request for a special instruction that the testimony of a State's witness should be carefully scrutinized if the jury found that the witness was testifying in return for special consideration from the police and prosecution since (1) there was no formal grant of immunity within the purview of G.S. 15A-1052(c), (2) the uncontroverted evidence at trial was that there was no "understanding or agreement" not to try the witness for murder or to reduce any charges or to recommend any sentence concessions as provided by G.S. 15A-1054(a), and (3) the instructions actually given revealed that the jury was made well aware that the witness's testimony was to be scrutinized closely.

2. **Criminal Law § 33— testimony of State's witness—not prejudicial**

   The trial court did not commit prejudicial error by allowing the State's witness to testify that he began doing undercover work after seeing the ef-

fects of drugs on two people. The testimony did not relate either to the crime or to the defendant or the victim, and the witness was available and was subjected to protracted cross-examination so that the jury could evaluate his sincerity and demeanor and "weigh" his testimony.

APPEAL by defendant from a judgment of the Superior Court entered following his convictions of murder and kidnapping.

Defendant's trial began during the 1 June 1982 Session of Superior Court, ASHE County, before *Judge Donald Smith.* A jury found defendant guilty of first-degree murder and first-degree kidnapping. The jury recommended a life sentence for the first-degree murder conviction and defendant was sentenced to a concurrent term of 40 years for the kidnapping conviction. Under N.C.G.S. § 7A-27(a) (1981) defendant appeals his murder conviction to this Court as a matter of right; on 16 February 1983 this Court allowed defendant's motion to bypass review by the Court of Appeals of his kidnapping charge so that the convictions could be consolidated for review.

*Rufus L. Edmisten, Attorney General, by George W. Boylan, Assistant Attorney General, for the State.*

*Adam Stein, Appellate Defender, by Malcolm R. Hunter, Jr., Assistant Appellate Defender, for defendant-appellant.*

FRYE, Justice.

Defendant presents on appeal three issues to this Court. First, he contends that the trial court committed reversible error in refusing to instruct the jury to carefully scrutinize the testimony of a particular witness if it found that the witness was testifying in return for special consideration from the police and prosecution. Second, defendant contends that the trial court erred by allowing a State's witness to testify that he began doing undercover work after personally seeing the effect of drugs on two people, testimony defendant claims is not only irrelevant but also prejudicial. Finally, defendant argues that the trial court erred in denying his motion to prohibit death qualification of the jury, permitting the State to ask prospective jurors death qualification questions, and striking for cause those jurors opposed to the death penalty. We have carefully reviewed each of these issues and hold that no prejudicial error was committed. Defendant, therefore, is not entitled to a new trial.

## I.

The State's chief witness and an eyewitness to the murder and kidnapping of the victim in this case, Lonnie Gamboa, was Joseph Eugene Vines. Before testifying to the events surrounding these crimes, Vines testified extensively about his background. He stated, in essence, that he makes his living traveling from city to city working as an undercover agent for various state and federal law enforcement agencies. It was this undercover work which Vines indicated brought him into contact on 20 December 1981 with two men, Gary Miller and "Red" Hattaway. After being introduced to Miller and Hattaway, Vines was told that he was "going to be doing some work with them so I could become part of their family."

The next day, Vines met Gamboa while he was sitting with Hattaway at a table in a Pizza Hut. At that time Hattaway told Gamboa that he owed him $120,000; Gamboa said he only owed Hattaway about $30,000. In addition, Hattaway asked Gamboa to tell him what happened to $380,000 worth of drugs that had come into town and for which he had not received any money. Hattaway also asked Gamboa if he had any property which he could sign over in order to help pay back the money he owed. Gamboa said he had two acres of land, a van and a trailer, the titles to which he would sign over to Hattaway.

On the morning of 23 December 1981, Hattaway called Vines and gave him the name which Gamboa was to use in transferring the titles to the various properties. In addition, he told Vines to tell Gamboa to bring the transcript of the trial in which Gamboa and Miller testified. Hattaway told Vines he wanted to read the transcript to determine which of the two men had lied at trial.

Later that day Vines picked up Gamboa at his home and drove to a bar. Hattaway later arrived and the three men then left the bar, got into Hattaway's car and drove to the parking lot of another bar where they picked up Miller. At that point, Miller asked Gamboa "why he was telling lies" on him. Gamboa's hands were then taped together and Gamboa was put into the trunk of the car and told he was being taken to Virginia "to talk to the big man." The four men then drove to the Blue Ridge Parkway in two cars, turning off onto an old paved rural road. After driving a short distance they arrived at defendant's house and parked in

front of an old blue trailer nearby. Gamboa was let out of the trunk and handcuffed to a tree. Miller and Vines then went to a garage located behind the blue trailer and Hattaway introduced Vines to defendant, Paul Wilson Bare, for the first time.

Later that evening, Vines and Miller went to the tree to which Gamboa was handcuffed, uncuffed him, and the three went to the garage near Bare's home. Still later that evening, after conferring with Miller and Hattaway, Bare told Gamboa that he would have to go to the "big man's house." Bare then left the garage, returning a few minutes later with a white rag or towel. At that point, Bare told Gamboa that he was going to have to blindfold him because he did not want him to know where he lived "even though we are going through the back way, through the fence" presumably to get to the big man's house. Bare put the blindfold on Gamboa. Bare, Gamboa, Miller and Vines then got into a truck which Bare drove.

After driving 10 or 15 minutes, Bare stopped the truck. Vines helped Gamboa out of the truck; Bare then led the group up a little hill of small pines and seedlings. Bare headed for a fence; the group followed. Bare then took Gamboa by the arm and led him through a hole in the fence. Bare motioned to Vines with his shotgun for Vines to follow Gamboa. Just inside the fence Vines stated he saw a huge hole, a mine shaft. Miller motioned to Vines to push Gamboa into the hole. Vines did so but Gamboa did not fall all the way. Bare told Vines to help Gamboa out of the hole, giving him a six-foot long limb to do so. After Vines helped Gamboa out of the hole, Bare then motioned with his shotgun to Vines for him to shove Gamboa into the hole again. Vines did so. This time Gamboa apparently fell all the way down the hole. Bare then threw the six-foot tree limb into the hole. At that point, Vines testified that the following conversation took place:

A. Then Mr. Bare told us to pick up some rocks, couple of rocks apiece and throw them down the hole to make sure Mr. Gamboa wasn't hung up anywhere in the hole, which Mr. Miller and I did, we each threw two stones about this size.

Q. Is that about eight inches across?

A. Like river rocks, kind of oblong and round.

Q. What happened next?

A. As they went down it sounded like they hit a couple of times and sounded like they hit something that was tin and at that time Mr. Miller turned to Mr. — and said, 'That makes 22.' and Mr. Bare said, 'No, that's 23.'

Bare was found guilty of first-degree kidnapping and first-degree murder on the basis of premeditation and deliberation. During the sentencing phase of the trial, the jury found three aggravating circumstances: (1) that defendant had previously been convicted of a felony involving the use of violence to the person; (2) that the capital felony was committed while defendant was engaged in the commission of a kidnapping; and (3) that the murder was especially heinous, atrocious or cruel. The jury, however, recommended a life sentence after determining that they could not unanimously find beyond a reasonable doubt that the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty. Defendant was sentenced to life in prison for the murder conviction and a concurrent term of forty years for the kidnapping conviction.

A.

[1] We first consider defendant's contention that the trial court committed reversible error in refusing defendant's request for a special instruction to the jury that the testimony of Vines should be examined with great care if the jury found that Vines was testifying in return for special consideration from the police and prosecution. With respect to defendant's request for special instructions, the trial court noted:

Mr. Siskind [defendant's attorney] asked that I instruct the jury as to the effect of witnesses having immunity or quasi-immunity and the court has refused because there is no evidence any witness has immunity from the State of North Carolina; the fact Mr. Vines testified he did not have immunity and could be indicted any time.

Defendant concedes that "[c]learly, the trial court was correct when it said that there had been no evidence of a formal grant of immunity." Accordingly, N.C.G.S. § 15A-1052(c) (1978), which requires the trial court to inform the jury of a grant of immunity and to "instruct the jury as in the case of interested witnesses,"

is not applicable.[1] However, defendant contends that because Vines had not been arrested or indicted in connection with the incident even though his own testimony indicated that he was guilty of murder, it is "crystal clear that the prosecutor had exercised his discretion under N.C.G.S. § 15A-1054 not to prosecute Vines at least in part upon the *understanding* that Vines would testify against Bare and others."[2]

It is only those special instructions which are supported by the evidence that must be given to the jury. *State v. Bock,* 288 N.C. 145, 158-59, 217 S.E. 2d 513, 522 (1975). The uncontroverted evidence at trial was that there was no "understanding or agreement" not to try Vines for murder or to reduce any charges or to recommend any sentence concessions as provided by N.C.G.S. § 15A-1054(a). Indeed, Vines testified as follows:

Q. Have you ever been promised anything else other than the Witness Protection Program for testimony you are giving here and participation in this case?

A. No sir I have not even been promised to put on Witness Protection; the case is still in Washington and still deciding if they are going to put me under witness protection. Not been promised anything by Mr. Chapman, Ashburn or anything else.

Q. So far as you know if they wanted to charge you today they could?

A. Yes sir.

Q. But they never said they wouldn't charge you, is that correct?

A. No sir, they didn't tell me they would not.

1. Specifically, N.C.G.S. § 15A-1052(c) provides as follows: "In a jury trial the judge must inform the jury of the grant of immunity and the order to testify prior to the testimony of the witness under the grant of immunity. During the charge to the jury, the judge must instruct the jury as in the case of interested witnesses. (1973, c. 1286, s. 1; 1975, c. 166, s. 27.)"

2. N.C.G.S. § 15A-1054(a) authorizes the prosecutor "when the interest of justice requires, . . . [to] exercise his discretion not to try any suspect for offenses believed to have been committed within the judicial district . . . upon the understanding or agreement that the suspect will provide truthful testimony in one or more criminal proceedings."

In addition, as the State points out, Thomas L. Chapman, a federal agent, testified with regard to the possible "indictment" of Vines as follows:

Q. Well sir, isn't it true in order to get into the program, if Mr. Ashburn is the man who did it, whoever is in charge, have to first tell the government they will not be indicted for the crime which he was involved?

A. No sir, that is incorrect, he could be put in the program if in fact at a later time he was going to be indicted.

. . . .

Q. Is it your testimony that no promise of immunity of any type have been given to Mr. Vines?

A. That's correct.

Q. And you discussed that with Mr. Ashburn and Mr. Waddell?

A. That's correct.

Q. And if any of the parties wanted to, who had the power and authority they could indict Mr. Vines at this time?

A. It's my understanding he could be indicted.

We conclude, therefore, that the trial court did not err in refusing defendant's request for special instructions because the evidence did not support the giving of such an instruction. Nevertheless, the trial court gave the jury an extensive instruction on evaluating the credibility of interested witnesses and in so doing referred to Vines specifically:

Now it may be that you will find that one or more of the witnesses who testified is what we call or refer to as an interested witness. Very simple, an interested witness is a witness who in some way is interested in the outcome of this case. In deciding whether or not to believe any witness who testifies you may take into account any interest that you find the witness has in the outcome of the case. If after doing that though you were to believe that witness either in whole or part you would treat then what you believe the same as you would treat any other evidence you might believe. Now as I

remember, but ladies and gentleman, you are required in your deliberations to take your recollection of the evidence, and not that of the court or the attorneys or any or all of us for that matter, but as I remember there was some evidence which tended to show the witness Vines, Joseph Vines, as I remember was an accomplice in the commission of the crimes charged in this case. There was also some evidence which tended to show that he was an informer or undercover agent for law enforcement purposes. But an accomplice is a person who joins with another in the commission of a crime. He may actually take part in the acts necessary to accomplish the crime or he may knowingly help or encourage another in the crime either before or during its commission. But ladies and gentleman, both informers or undercover agents and accomplices are considered by law to have an interest in the outcome of the case. Therefore you should examine every part of the testimony of Mr. Vines with the greatest care and caution. If after doing that though you were to believe his testimony either in whole or in part then you would treat what you believe the same as you would any other evidence that you might believe.

A comparison of the special instructions requested and the instructions actually given regarding Vines' testimony reveals that the jury was made well aware that Vines' testimony was to be scrutinized closely because, in one way or another, he was considered to have an interest in the outcome of this case. In sum, therefore, we find no error in the failure of the trial court to give the special instruction defendant requested.

### B.

[2] Defendant also contends that the trial court committed prejudicial error by allowing Vines to testify that he began doing undercover work after seeing the effects of drugs on two people. On direct examination, Vines testified about his "undercover-type investigative work" as follows:

Q. What caused you to decide to go into this type of work?

MR. MARGER: Objection.

THE COURT: Overruled.

A. Before that I had been in Atlanta, Georgia, and I watched a small boy 12 years old throw his guts up from an overdose of junk—

    MR. MARGER: Objection, motion to strike.

    THE COURT: Motion to strike is denied.

Q. Anything else?

A. Yes sir, I had a good friend of mine, a guy gave her what she thought was mescaline—

    MR. MARGER: Objection.

    THE COURT: Sustained as to what someone else thought.

A. But he gave her STP.

    MR. MARGER: Objection.

    THE COURT: Sustained.

Q. Just describe what you yourself saw Mr. Vines.

A. She had left and went out to see somebody and we didn't see her again for two weeks, and when we found her she was walking around the streets in a sack and she's still in a mental institution today far as I know.

    MR. MARGER: Objection.

    THE COURT: Sustained as to what he does or doesn't know.

The defendant contends that the admitted testimony is irrelevant in that it does not tend to establish the probability or improbability of any fact in issue, *Rush v. Beckwith*, 293 N.C. 224, 231, 238 S.E. 2d 130, 135 (1977), and that its only effect was to "unfairly capture the sympathy of the jury while prejudicing the jury against the defendant, with a completely collateral matter." The defendant seeks a new trial, relying upon *State v. Johnson*, 270 N.C. 215, 154 S.E. 2d 48 (1967); and *State v. Rinaldi*, 264 N.C. 701, 142 S.E. 2d 604 (1965).

The defendant's reliance upon *Johnson* and *Rinaldi* is misplaced. In *Johnson*, the admission of irrelevant testimony that

the victim was a disabled veteran combined with the trial court's failure to permit testimony of prior specific acts of violence by the deceased victim prevented the defendant from adequately presenting his defense of self-defense to a murder charge. In *Rinaldi* this Court granted a new trial to the defendant in a murder case because the court erroneously permitted testimony indicating that the defendant had attempted a homosexual act with the witness. The testimony was prejudicial under the well-established rule that evidence of a separate, independent crime by a defendant cannot be used to prove the crime for which he is currently being tried.

In *Johnson*, the challenged testimony related to the character of the victim of the crime; in *Rinaldi* the character of the defendant. Here the challenged testimony related neither to the victim of the crime nor defendant but instead to the witness — his reason or motive for entering a particular kind of work. In both *Johnson* and *Rinaldi* the challenged testimony was used by the prosecutor as evidence to prove the State's case — in *Johnson* to disprove defendant's defense of self-defense and in *Rinaldi* to show that the defendant was the type of person who would commit murder.

In contrast, the prosecutor in this case could not and did not use the challenged testimony to prove or disprove any element of the murder or kidnapping since the testimony did not relate to either crime or to the defendant or the victim. Assuming *arguendo*, however, that the testimony was irrelevant, it was not prejudicial. Vines was available and was subjected to protracted cross-examination so that the jury could evaluate his sincerity and demeanor and "weigh" his testimony. Under these circumstances, there is no "reasonable possibility" that the jury would have reached a different result if it had not heard this testimony. N.C.G.S. § 15A-1443(a) (1978).

### C.

Finally, defendant contends that the trial court erred in denying his motion to prohibit death qualification of the jury, in permitting the State to ask prospective jurors death qualification questions, and in striking for cause those jurors opposed to the death penalty. In essence, defendant contends that although he received a life sentence, "the death qualifying" of the jury prior to the guilt phase resulted in a guilt prone jury thereby depriving

him of the right "to a fair trial, fair sentencing hearing, a jury chosen from a cross-section of the community, equal protection of the law and due process of law." Although defendant recognizes that this Court has decided this same issue against him in *State v. Avery,* 299 N.C. 126, 261 S.E. 2d 803 (1980), he nevertheless urges us to re-examine our position. We decline to do so at this time. *See also State v. Williams,* 305 N.C. 656, 292 S.E. 2d 243 (1982); *State v. Taylor,* 304 N.C. 249, 283 S.E. 2d 761 (1981).

In sum, therefore, we hold that defendant received a trial free of prejudicial error.

No error.