STATE OF NORTH CAROLINA v. FREDDIE LEE STOKES

No. 553A83

(Filed 3 February 1987)

**1. Courts § 15; Infants § 11— trial of juvenile as adult—constitutionality of statute not presented**

The contention of the seventeen-year-old defendant that the statute permitting persons sixteen or more years old to be prosecuted as adults, N.C.G.S. 7A-517(20), creates unconstitutional classifications has no bearing on defendant's prosecution for first degree murder because defendant was not tried in superior court pursuant to the classifications contained in N.C.G.S. 7A-517(20) but was tried as an adult pursuant to N.C.G.S. 7A-608, which authorizes the juvenile court in ordinary felonies and requires it in capital felonies, upon a finding of probable cause, to transfer juveniles who were fourteen years of age or older at the time of the offense to superior court for trial as adults.

**2. Criminal Law §§ 76.3, 135.6— failure to object to out-of-court statement—tactical decision—waiver**

Defendant's failure to object at trial to the State's introduction of his out-of-court statement during the *Enmund* issues phase of a capital sentencing proceeding waived his right to complain of its admission on appeal where defendant's statement was the only evidence supporting submission of *Enmund* issues, and defendant thus made a tactical decision to let the evidence come in without objection.

**3. Criminal Law § 135.8— first degree murder—especially heinous aggravating circumstance—sufficient evidence**

Submission of the "especially heinous" aggravating circumstance in defendant's first degree murder trial was supported by evidence of the nature and extent of the fatal wounds inflicted and the victim's lingering death. The question of the sufficiency of evidence to support submission of this issue was controlled by the decision in a prior appeal arising out of the same incident but involving one of defendant's accomplices who pled guilty to second degree

1

State v. Stokes

murder that such evidence was sufficient to support submission of the "especially heinous" aggravating circumstance. N.C.G.S. 15A-2000(e)(9).

4. **Criminal Law § 135.4— capital sentencing proceeding — Enmund issue — burden of proof — sufficiency of evidence**

The State's burden of proof on an *Enmund* issue in a capital sentencing proceeding is proof beyond a reasonable doubt. The test for the sufficiency of the evidence on such an issue is the same as that ordinarily applied in criminal cases.

5. **Criminal Law § 135.4— capital sentencing proceeding — Enmund issues — delivery of fatal blows**

It is not necessary under *Enmund v. Florida*, 458 U.S. 782 (1982), that a capital defendant in order to be executed be the only person who delivered fatal blows to the victim; rather, it is enough if the capital defendant is one of two or more who delivered fatal blows.

6. **Criminal Law § 135.4— capital sentencing proceeding — Enmund issues — delivery of fatal blows — sufficient evidence**

The evidence in the phase of a capital sentencing hearing directed to *Enmund* issues was sufficient to permit the jury to find beyond a reasonable doubt that defendant himself delivered fatal blows to the victim where a State's witness testified that defendant, armed with a stick, and an accomplice, armed with "some kind of object," accosted the victim at 6:30 p.m. on a ramp just outside the door to his warehouse for the purpose of robbing him; a struggle ensued in which defendant was "bent over"; at approximately 8:30 p.m. the victim was discovered, semi-conscious, lying on the ramp where the attack occurred; he had gashes on his head and his skull had been crushed; and the victim died some fourteen hours after the attack from head injuries.

7. **Criminal Law § 135.10— death sentence disproportionate**

A sentence of death imposed on defendant for first degree felony murder was excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant, where the State's evidence tended to show that both defendant and an accomplice committed the same crime in the same manner; the accomplice received a sentence of life imprisonment in a separate trial; defendant may be less deserving of death than the accomplice in view of mitigating circumstances in his case; juries in this state almost always recommend life imprisonment when the defendant's conviction in a robbery-murder case rests solely on a felony murder theory; defendant's crime was less aggravated than those involved in the four robbery-murder cases in which juries have recommended the death penalty following a conviction based solely on a felony murder theory; and defendant's crime was similar to and no worse than the one involved in a case in which the Supreme Court found the death penalty to be disproportionate. Therefore, defendant's sentence of death is vacated and a sentence of life imprisonment is imposed. N.C.G.S. 15A-2000(d)(2).

Justice MITCHELL dissenting in part.

Justice WEBB joins in this dissenting opinion.

APPEAL by defendant from a death sentence imposed at the 24 October 1983 Session of NEW HANOVER Superior Court, *Judge Stevens* presiding.

*Lacy H. Thornburg, Attorney General, by Joan H. Byers, Special Deputy Attorney General, for the state.*

*Arnold Smith for defendant appellant.*

EXUM, Chief Justice.

This appeal is from a new sentencing hearing ordered by this Court in *State v. Stokes*, 308 N.C. 634, 304 S.E. 2d 184 (1983), at which a death sentence was imposed. Defendant contends: (1) The court lacked jurisdiction over him; (2) there was error in admitting his out-of-court statement; (3) the evidence was insufficient to support the "especially heinous" aggravating circumstance and submission of an *Enmund* issue[1] to the jury; and (4) his death sentence was excessive or disproportionate when considered against sentences imposed in similar cases. We find no error in the proceeding. We agree that the death sentence is excessive and disproportionate. The death sentence is, therefore, set aside and a sentence of life imprisonment is imposed.

I.

On 28 December 1981 between 6 and 6:30 p.m., four young men, Ricky Benbow, Lorenzo Thomas, James Murray, and defendant here, Freddie Stokes, all in their late teens or early twenties, conspired to and did rob Kauno Lehto at his Wilmington Bonded Warehouse.[2] In the course of the robbery Lehto was beaten severely on and about the head. The blows fractured his skull and caused hemorrhaging into his brain from which Lehto died some fourteen hours after the attack.

In January 1982 Thomas gave a statement to Wayne Norris, a Wilmington police investigator, implicating himself and his

---

1. *Enmund* issues, described in text *infra* pp. 4-6, stem from *Enmund v. Florida*, 458 U.S. 782, 73 L.Ed. 2d 1140 (1982), discussed in text *infra* p. 5.

2. Some of these background facts and those which follow are taken from earlier appeals of cases arising out of this incident: *State v. Murray*, 310 N.C. 541, 313 S.E. 2d 523 (1984); *State v. Benbow*, 309 N.C. 538, 308 S.E. 2d 647 (1984); *State v. Stokes*, 308 N.C. 634, 304 S.E. 2d 184.

three accomplices in the crimes committed against Lehto. Information provided by Thomas resulted in the arrests of Benbow, Murray and Stokes. Ultimately Thomas pled guilty to second degree murder and was sentenced to fifteen years' imprisonment. Benbow pled guilty to second degree murder and was sentenced initially to life imprisonment but on appeal won a new sentencing hearing. At his new sentencing hearing Benbow, on 1 May 1984, was sentenced to twenty-five years' imprisonment.[3]

Both Murray and Stokes entered pleas of not guilty; at separate trials both were convicted by juries of first degree felony murder, armed robbery and felonious larceny. In both cases judgment was arrested on the armed robbery conviction; defendants were sentenced to ten years' imprisonment on the larceny conviction, and sentencing hearings were conducted on the first degree murder conviction. In Murray's case the jury recommended that he be sentenced to life imprisonment[4] and judgment was entered accordingly. This Court found no error in Murray's trial. *State v. Murray*, 310 N.C. 541, 543, 313 S.E. 2d 523, 526 (1984).[5]

## A.

As for Stokes, the defendant here, the jury at his first trial recommended as punishment for the murder a sentence of death, and judgment was entered accordingly. *State v. Stokes*, 308 N.C. at 641, 304 S.E. 2d at 187. This Court found no error in the guilt phase of Stokes' trial but, finding error in the sentencing phase, ordered that a new sentencing hearing be conducted. *Id.* at 658, 304 S.E. 2d at 199. At the new sentencing hearing, from which the present appeal is taken, the jury again recommended a sentence of death, which was imposed.

On Stokes' first appeal, he contended, and this Court agreed, that he was entitled to have *Enmund* issues submitted to the jury before the jury considered the issues mandated by our capital sentencing statute, N.C.G.S. § 15A-2000. In *Enmund* the United

---

3. *State v. Benbow*, 82CRS17355, New Hanover Superior Court.

4. See Issues and Recommendations as to Punishment, file No. 82CRS10109, New Hanover Superior Court.

5. The Court did remand the larceny case against Murray for a new sentencing hearing. *State v. Murray*, 310 N.C. at 554, 313 S.E. 2d at 532.

States Supreme Court considered a Florida death sentence imposed on Enmund, who had participated with two others in the burglary-murder of an elderly couple. The two others had actually entered the couple's home where they murdered the victim. Enmund drove the getaway car. Enmund was convicted of felony murder as an aider and abettor, or principal in the second degree. Because there was no proof "that Enmund killed or attempted to kill, . . . [or] intended or contemplated that life would be taken . . .," the Supreme Court concluded Enmund's death sentence was excessive under the Eighth and Fourteenth Amendments. *Enmund v. Florida*, 458 U.S. 782, 801, 73 L.Ed. 2d 1140, 1154 (1982).

At Stokes' first trial the state's evidence, briefly summarized, was as follows: Lorenzo Thomas testified that Ricky Benbow, in the presence of James Murray and defendant, told Thomas that Benbow, Murray and defendant were going to Lehto's warehouse to rob Lehto; Benbow asked Thomas to be a lookout and Thomas agreed. Thomas later observed Murray and defendant struggling with the victim on a ramp leading to one of the warehouse's doors. Benbow was at the bottom of the ramp. Murray, Benbow and defendant left the scene in Lehto's car with defendant driving. The state also offered defendant's out-of-court statement. According to this statement defendant acted as lookout while Benbow and Thomas went to the warehouse. There Thomas struck Lehto, and Thomas and Benbow robbed Lehto of Lehto's car keys and money.

Defendant, himself, testified that he had no part in the crimes at all and offered evidence of an alibi.

The trial court instructed the jury that Stokes could be found guilty of first degree murder on the theory that he actually struck the fatal blows or on the theory that, as a lookout for other accomplices, he was an aider and abettor. The jury returned a general verdict of guilty without specifying upon which of these theories it relied.

On Stokes' first appeal, this Court concluded that defendant was entitled to a new sentencing hearing at which special issues required by *Enmund* would be submitted and answered by the jury. The Court noted that, unlike *Enmund*, there was enough evidence from which a jury could find that Stokes himself in-

flicted the fatal blows; therefore Stokes was not entitled, as En-mund was, to have his death sentence vacated as a matter of law. Stokes' out-of-court statement, however, offered by the state, was some evidence to the contrary, tending to show defendant at·most acted as a lookout for other accomplices. This created an eviden-tiary conflict on the question of the extent of Stokes' participation in the murder — a conflict which, under *Enmund*, must be resolved by the jury favorably to the state before Stokes could be sen-tenced to death. The Court ordered a new sentencing hearing at which the following issues would be submitted to and answered by the jury as the Court directed:

> 1. Did defendant deliver the fatal blows which caused the vic-tim's death?

> 2. If not, did defendant, while acting as an aider and abettor, attempt to kill, intend to kill, or contemplate that life would be taken during the commission of the felony?

> Of course, defendant and the State will be permitted to offer competent evidence pertinent to the resolution of these issues.

> If the jury should answer either of the above-stated questions 'yes,' then the jury would proceed to hear compe-tent evidence concerning the aggravating and mitigating cir-cumstances and return its recommendation as to whether defendant's punishment should be imprisonment for life or the death sentence. However, if the jury should answer both issues 'no,' it would return a recommendation of life imprison-ment.

*State v. Stokes*, 308 N.C. at 651-52, 304 S.E. 2d at 195.

On Stokes' first appeal this Court also concluded there was error in failing to submit the following statutory mitigating cir-cumstances, timely requested by defendant, because there was evidence from which a jury could reasonably find their existence:[6] (1) Defendant was under the influence of a mental or emotional disturbance, (f)(2); (2) defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the re-quirements of law was impaired, (f)(6); and (3) defendant's par-

---

6. Statutory references will be to subsections of N.C.G.S. § 15A-2000.

ticipation in the capital felony was relatively minor, (f)(4). The Court also concluded the following nonstatutory mitigating circumstances, timely requested by defendant, should be submitted at defendant's new sentencing hearing if there was evidence to support them because a jury could reasonably find them to have mitigating value: (1) Defendant in his formative years was subjected to cruelty and abuse by his parents; (2) defendant in his formative years was subjected to mental abuse by his parents. *State v. Stokes*, 308 N.C. at 654-57, 304 S.E. 2d at 198.

B.

Defendant's new sentencing hearing, from which the instant appeal is taken, was, according to our direction, conducted in two phases. The first phase was directed to *Enmund* issues. In this phase the state offered essentially the same evidence it had offered in the guilt phase of defendant's first trial. The state's key witness was, again, Lorenzo Thomas, who testified as follows: On the day of the crime Ricky Benbow approached him and said, "I'd like for you [Thomas] to be a lookout man while we go up to the Wilmington Bonded Warehouse and take some money from the old man." James Murray and defendant were with Benbow. Thomas never replied but he did join the other three, all of whom were prior acquaintances. Defendant "had a stick in his hand, and Murray, he had something up his arm, but I really couldn't see what it was, but to me, it looked like some kind of object." The stick in defendant's hand was 16 to 18 inches long.[7] Thomas walked with the others to the Wilmington Bonded Warehouse where he was to "[b]e the lookout man." At the warehouse Thomas observed Benbow at the foot of the ramp and Murray and Stokes on either side of a bay door to which the ramp led. Thomas then walked around the area for about five minutes. He returned to a position where he could observe the ramp. He saw Benbow "still standing at the foot of the ramp, . . . Murray and . . . Stokes was [sic] bent over; looked like some type of struggle to me . . . . I couldn't say what was going on because I wasn't there; I was on the other side of

7. Thomas had difficulty describing the stick's diameter. At one point he testified it was "[l]ike a piece of stick from off a tree," but not like a "tree limb." He said it was "a little old stick like." Later he said it was approximately the size of "or a little larger than, a pencil in diameter." Still later he said the stick was "two and a half" in diameter, but he would not say whether he meant inches or some other unit of measure.

the street." Stokes was holding his stick, but "[w]hat he done with it, I don't know." Murray had his stick "underneath his arm; you could hardly see his." Thomas then left the area. "The last time I saw [Stokes] is when I saw him bent over on that ramp." Three to five minutes later Thomas observed Stokes driving the victim's car with Benbow in the front seat and Murray in the back. Still later Thomas met Benbow, Murray, and Stokes. Stokes gave Thomas a bag of marijuana "[f]or being a lookout man."

The state also offered, without objection, defendant's out-of-court statement. According to this statement, Stokes, Benbow and Thomas went to the warehouse. Thomas "had a stick in his hand." When they got to the warehouse, Stokes "broke away from . . . Benbow and . . . Thomas and went to an area . . . directly across the street from the" warehouse to serve as a lookout. Benbow and Thomas went up the ramp to the bay door. "When the old man came out of the door . . . Thomas struck the old man." Thomas "again struck the old man, and the old man fell to the concrete." Benbow and Thomas went "through the old man's pockets." Stokes observed "blood coming from the old man's mouth; he was spitting out blood." Thomas later had a wallet from which Stokes got $150. Stokes also got a set of car keys from Thomas, "unlocked the car that was parked in the parking lot and left by himself."

Defendant offered no evidence at the *Enmund* issue phase of the new sentencing hearing.

After arguments and instruction the following issue was submitted to and answered by the jury affirmatively:[8]

> Did the defendant, Freddie Lee Stokes, deliver the fatal blows which caused the death of Kauno Lehto?

The sentencing hearing then proceeded to the phase where the jury was asked to consider statutory issues pursuant to

---

8. The following issue was also submitted:

"Did the defendant, Freddie Lee Stokes, while acting as an aider or abettor either attempt to kill, intend to kill, or contemplate that life would be taken during the commission of the felony, (Robbery with a dangerous weapon)?"

Following the court's instruction and having answered the first issue "yes," the jury did not consider this issue.

N.C.G.S. § 15A-2000. During this phase of the new sentencing hearing the state relied entirely on evidence it had produced during the *Enmund* issue phase. Defendant offered evidence which tended to show as follows: Defendant grew up with his mother and three siblings in a subsidized housing project for low-income families. Defendant is mildly, mentally retarded and was enrolled in a "special education" curriculum in the elementary grades. Defendant was placed on juvenile probation at age nine for breaking into an automobile and stealing tapes and for stealing cookies from a grocery store. Later he violated his probation by striking a teacher and was sent to Samarkand Manor, a juvenile rehabilitation center, in February 1976. He was granted a conditional one-year release from Samarkand in October 1976, which he successfully completed. Thereafter, defendant, at age fourteen, was involved in other breakings into schools and stealing school window air conditioners. He was sent back to Samarkand on a two-year commitment in 1979 and was unconditionally discharged in August 1981 at age sixteen.

Defendant at age eleven at Samarkand in 1976 was treated by Dr. Rolf Henry Fisscher, a staff psychiatrist. Dr. Fisscher treated defendant with various medications to control defendant's outbursts of temper and aggressive behavior towards other students and teachers. He diagnosed defendant as being borderline mentally retarded with a "full scale I.Q. of 70."

Defendant also offered certain reports from physicians at Dorothea Dix Hospital where, after the present charges were brought, defendant, then age eighteen, was sent to have determined his competency to stand trial. These reports reveal the following information about defendant. Testing showed defendant had an I.Q. of 63 and read at grade level 2.9. "There were hints of aggressive tendencies." Defendant "attended to his personal needs appropriately and adjusted fairly well to the ward. Occasionally he has been noisy or intimidating or aggressive, but he has seemed able to control his behavior." Defendant was ultimately diagnosed as having an "antisocial personality disorder."

Only defendant's mother and an older sister took an interest in defendant during the time he was under the supervision of a juvenile court from 1974 to 1981. Defendant's father lived in Brunswick County and is disabled. He was never married to de-

fendant's mother. He never communicated with defendant's family court counselor during the years in question; but he was present in the courtroom during most of defendant's new sentencing proceeding. When defendant was eight or nine years old there was "a whole lot of drinking in [his] family." His mother "drank a whole lot," and his older sister, "who pretty much raised" defendant, tried to hide his mother's drinking from defendant and the other siblings. Defendant got little supervision from his mother, and the family did not attend church or Sunday school.

After arguments and instructions, statutory issues pursuant to N.C.G.S. § 15A-2000 were submitted to and answered by the jury. Only one aggravating circumstance, that the murder was "especially heinous, atrocious, or cruel," (e)(9),[9] was submitted to the jury and answered favorably to the state. Twelve mitigating circumstances were submitted. The jury, without specifying which ones, found "one or more" of the following statutory and nonstatutory mitigating circumstances to exist:

STATUTORY MITIGATING CIRCUMSTANCES

(1) Defendant has no significant history of prior criminal activity. (f)(1).

(2) The murder was committed while defendant was under the influence of a mental or emotional disturbance. (f)(2).

(3) The capacity of defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired. (f)(6).

(4) Defendant's age, seventeen, at the time of the crime. (f)(7).

NONSTATUTORY MITIGATING FACTORS

(1) Defendant's mother's habitual use of alcohol during his formative years.

(2) Defendant's own abuse of drugs and alcohol.

(3) Defendant's subjection to mental abuse by his parents during his formative years.

9. All statutory references will be to subsections of N.C.G.S. § 15A-2000.

(4) Defendant's lack of religious and moral training during his formative years.

(5) Defendant's love and affection for his mother and siblings.

(6) Original purpose of criminal enterprise was to commit a robbery and not a murder.

(7) Defendant is an illegitimate child and has never experienced a relationship with his natural father.

(8) Any aspect of defendant's character, record, or reputation or any other circumstance deemed by the jury to have mitigating value.

The jury then determined: (1) The mitigating circumstance(s) found was (were) insufficient to outweigh the aggravating circumstance found, (b)(2), and (2) the aggravating circumstance was sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance(s) found, (b)(1); *State v. McDougall*, 308 N.C. 1, 301 S.E. 2d 308, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 173 (1983).

The jury recommended that defendant be sentenced to death and Judge Stevens entered judgment accordingly.

## II.

[1] Defendant was seventeen years old when the criminal acts in this case occurred. His first argument is that the superior court lacked jurisdiction to try him. N.C.G.S. § 7A-517(20), relating to juveniles, permits persons sixteen or more years old to be prosecuted as adults. Defendant argues this creates a classification which, in defendant's words, is so "arbitrary, fundamentally unfair," and "discriminatory" as to violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment and the Equal Protection and Law of the Land Clauses of Article I, section 19 of the North Carolina Constitution.

N.C.G.S. § 7A-517(20) defines a juvenile as "any person who has not reached his eighteenth birthday and is not married, emancipated, or a member of the armed services of the United States." This section then provides that, "For the purposes of subdivisions (12) and (28) of this section, a juvenile is any person who has not

reached his sixteenth birthday and is not married, emancipated, or a member of the armed forces." Subdivision (12) of the section defines a "delinquent juvenile" as "Any juvenile less than 16 years of age who has committed a criminal offense under State law or under an ordinance of local government, including violation of the motor vehicle laws." Subdivision (28) of the section defines an "undisciplined juvenile" as "A juvenile less than 16 years of age who is unlawfully absent from school; or who is regularly disobedient to his parent, guardian, or custodian and beyond their disciplinary control; or who is regularly found in places where it is unlawful for a juvenile to be; or who has run away from home." N.C.G.S. § 7A-524 provides that "[a]ny juvenile who is under the jurisdiction of the court and commits a criminal offense after his sixteenth birthday is subject to prosecution as an adult." Finally, N.C.G.S. § 7A-608 provides:

> The court after notice, hearing, and a finding of probable cause may transfer jurisdiction over a juvenile 14 years of age or older to superior court if the juvenile was 14 years of age or older at the time he allegedly committed an offense which would be a felony if committed by an adult. If the alleged felony constitutes a capital offense and the judge finds probable cause, the judge shall transfer the case to the superior court for trial as in the case of adults.

Defendant's argument is directed solely to the classifications contained in N.C.G.S. § 7A-517(20). He says there is no rational basis for making a distinction, in terms of criminal responsibility for the same offense, between fifteen year olds and sixteen year olds.

Defendant's argument has no bearing on this case. Defendant was not tried in superior court pursuant to the classifications contained in N.C.G.S. § 7A-517(20). He was tried in superior court as an adult pursuant to N.C.G.S. § 7A-608. This section authorizes the juvenile court in ordinary felonies and requires it in capital felonies, upon a finding of probable cause, to transfer juveniles who were "fourteen years of age or over" at the time of the offense to superior court for trial as adults. Defendant makes no challenge to the classification contained in N.C.G.S. § 7A-608.

Assignment of error No. 1, giving rise to defendant's constitutional argument with regard to classifications in juvenile

statutes having no bearing on the instant case is, therefore, over-ruled.

### III.

**[2]** Defendant's next contention, based on his assignment of error No. 2, is that the trial court erred in admitting into evidence defendant's out-of-court statement in the *Enmund* issue phase of the case. Defendant relies solely on *State v. Fincher*, 309 N.C. 1, 305 S.E. 2d 685 (1983). In *Fincher* we held a person defined as a juvenile by N.C.G.S. § 7A-517(20) was entitled before questioning to be advised of his rights pursuant to N.C.G.S. § 7A-595(a), which provides:

> (a) Any juvenile in custody must be advised prior to questioning:
>
> (1) That he has a right to remain silent; and
>
> (2) That any statement he does make can be and may be used against him; and
>
> (3) That he has a right to have a parent, guardian or custodian present during questioning; and
>
> (4) That he has a right to consult with an attorney and that one will be appointed for him if he is not represented and wants representation.

Fincher at the time his inculpatory statement was taken was seventeen. Fincher objected at trial to the admission of his statement. Evidence at voir dire demonstrated affirmatively that Fincher was not advised of his right to have a "parent, guardian or custodian present during questioning." The trial court concluded that defendant was not entitled to be advised pursuant to N.C.G.S. § 7A-595(a)(3) because he was being tried as an adult, not a juvenile. On Fincher's appeal this Court disagreed. We concluded Fincher was entitled to be advised pursuant to N.C.G.S. § 7A-595(a). For failure of the investigators to advise Fincher of his right to have a "parent, guardian or custodian present during questioning," as the statute required, this Court held Fincher's statement should not have been admitted against him. Because, however, of the overwhelming evidence of Fincher's guilt, other than his statement, the Court also concluded its admission did not amount to reversible error.

In the instant case, although *Fincher* was decided some two and a half months before defendant's second sentencing hearing, defendant did not object to the admission of his statement. No voir dire was conducted, and the question whether defendant was advised of his rights under N.C.G.S. § 7A-595(a) was never addressed at trial. Neither was it addressed at Stokes' first trial conducted before the *Fincher* decision.

Where a defendant fails at trial to object to the admission of evidence, he may not, in the absence of plain error, rely on its admission as error on appeal. *State v. Black*, 308 N.C. 736, 303 S.E. 2d 804 (1983). Indeed, a defendant may not raise on appeal a ground, not raised at trial, for challenging the admissibility of a confession even though at trial admissibility was challenged on other grounds. *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177 (1983).

This Court has been slow to apply the waiver rule in capital cases. *But see id.* There is authority for the Court in capital cases to examine the record on its own motion for reversible error whether excepted to at trial or assigned as error on appeal. *State v. Buchanan*, 287 N.C. 408, 215 S.E. 2d 80 (1975); *State v. Fowler*, 270 N.C. 468, 155 S.E. 2d 83 (1967); *State v. McCoy*, 236 N.C. 121, 71 S.E. 2d 921 (1952). But the Court has also said in considering questions arising from the admission of evidence:

> A defendant, however, in a capital case who fails to make even a general objection at trial when doing so could have saved the trial from error runs a high risk of waiving his right to complain on appeal where the incident complained of is not patently erroneous, or if erroneous, not patently prejudicial.

*State v. Strickland*, 290 N.C. 169, 182, 225 S.E. 2d 531, 541 (1976); *see also State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335.

Here we have no hesitancy in holding that defendant's failure to object at trial to the state's introduction of his out-of-court statement waives his right to complain of its admission on appeal. According to defendant's statement, he was standing across the street serving as a lookout when his accomplice Thomas actually struck the victim. Defendant said he observed blood coming from the victim's mouth. Defendant argues the statement was hurtful

to him because it enabled the state to discredit it entirely before the jury on the ground defendant's observation of the blood would have been physically impossible given the distance from the point of the beating to the place where defendant claimed to have observed it. The state argued defendant could have known of the blood only if he was participating in the attack; therefore the jury should consider his statement as being evidence that he did participate. Because the state was able to make this argument about the statement, defendant says the statement prejudiced him in the jury's eyes and helped cause the jury to find against him on the *Enmund* issue. He argues we should not apply the waiver rule and consider the merits of the admissibility issue.

We disagree. On defendant's first appeal he argued that *Enmund* issues should have been submitted to the jury at the sentencing phase of the proceeding. In agreeing with this argument, this Court relied on defendant's out-of-court statement as providing the sole evidentiary basis for the submission of *Enmund* issues. At defendant's new sentencing hearing this statement, again, was the only evidence supporting submission of *Enmund* issues. Without it, *Enmund* issues need not have been submitted because all of the other evidence in the case tended to show defendant himself inflicted the fatal blows. Thus there are aspects of this statement which enabled the state to argue against its credibility and to defendant's detriment, but the statement's substance provides the only evidentiary basis for defendant's principal defense against imposition of the death penalty. Under these circumstances it is imperative that defendant decide at trial whether he wants the statement admitted or not. It is a tactical decision that can only be made by defendant, not the court. A defendant may not, for tactical reasons, fail to object at trial to evidence he hopes will help him and later on appeal assign admission of that evidence as error when in light of the jury's verdict the evidence was not helpful, or was even hurtful, to defendant. The waiver rule was designed precisely to prevent this kind of second-guessing of the probable impact of evidence on the jury by parties who lose at the trial level. Defendant made his tactical decision to let the evidence come in at trial without objection. He may not now be heard to complain.

## IV.

[3]   Next defendant argues there was no evidence to support submission of the "especially heinous" aggravating circumstance described by N.C.G.S. § 15A-2000(e)(9). We disagree.

*State v. Benbow*, 309 N.C. 538, 308 S.E. 2d 647 (1983), controls this question contrary to defendant's contention. *Benbow* was an appeal arising out of the same incident as is now before us but involving one of defendant's accomplices who pled guilty to second degree murder. In *Benbow* we held the nature and extent of the fatal blows inflicted upon the victim, Lehto, and Lehto's having "lingered and remained in a semiconscious state for over twelve hours," supported the trial court's finding in aggravation under the Fair Sentencing Act, N.C.G.S. § 15A-1340.4(a)(1)f, that the crime was "especially heinous, atrocious, or cruel." The only difference in the cases is that Benbow was sentenced under the Fair Sentencing Act upon a plea of guilty to second degree murder and Stokes was sentenced under the capital sentencing statute upon a verdict of guilty to first degree, felony murder.

It will not always be appropriate to compare sentences under the two different statutes to decide in a given case whether the evidence supports a finding of the "especially heinous" circumstance. *State v. Blackwelder*, 309 N.C. 410, 306 S.E. 2d 783 (1983). For example, it might not be appropriate to compare a felonious assault case in which the especially heinous circumstance was supported by the evidence to determine whether the circumstance was likewise supported in a first degree murder case even though, except for the death of the victim, the cases are factually similar. "Rather, the focus should be on whether the facts of the case disclose excessive brutality, or physical pain, psychological suffering, or dehumanizing aspects not normally present" in the very offense under consideration. *Id.* at 414, 306 S.E. 2d at 786 (emphasis in original omitted).

Here, however, we see nothing which distinguishes *Benbow* on the question of whether the "especially heinous" circumstance was supported by the evidence. If it was supported in *Benbow* by evidence of the nature of the fatal wounds inflicted and the victim's lingering death, it must likewise be supported by the same evidence in the instant case. The facts upon which the circumstance rests in both cases are identical and the differences be-

tween second degree murder and first degree felony murder are not material on the issue. Defendant concedes as much in his brief but suggests that the Court "reconsider its decision" in *Benbow* on this point. We think the issue was properly decided in *Benbow* and that *Benbow* controls it here; consequently we conclude the evidence supports the jury's finding of the existence of the especially heinous circumstance.

## V.

At the close of evidence in the *Enmund* issue phase of the case, defendant moved for the imposition of a sentence of life imprisonment on the ground the evidence was insufficient to permit a jury to answer the *Enmund* issues favorably to the state. The motion was denied, and defendant assigns error to the ruling.

Defendant's argument is that the evidence was not enough to permit a jury to find beyond a reasonable doubt that defendant himself delivered the fatal blows to the victim. In essence, defendant contends he was entitled to a directed verdict in his favor on this issue. We disagree.

[4] For the purpose of measuring the sufficiency of evidence on an *Enmund* issue in a capital sentencing proceeding, we think the issue should be treated like other issues the jury must answer under our capital sentencing statute, N.C.G.S. § 15A-2000. Under this statute the jury must, in order to recommend a death sentence, answer certain issues favorably to the state. The state's burden of proof on these issues is beyond a reasonable doubt. *State v. McDougall*, 308 N.C. 1, 301 S.E. 2d 308; *State v. Silhan*, 302 N.C. 223, 275 S.E. 2d 450 (1981). Therefore, the state's burden of proof on an *Enmund* issue must be, as the trial court here properly instructed, beyond a reasonable doubt. Since the state's burden of proof on an *Enmund* issue is the same as that in any other criminal case, the test for the sufficiency of the evidence on such an issue should likewise be the same as is ordinarily applied in criminal cases.

That test may be stated as follows: All evidence admitted, competent or incompetent, favorable to the state must be considered. The evidence must be taken in the light most favorable to the state. The state is entitled to all reasonable inferences that may be drawn from the evidence. Contradictions in the evidence

are resolved favorably to the state. *State v. Brown*, 310 N.C. 563, 313 S.E. 2d 585 (1984); *State v. Thomas*, 296 N.C. 236, 250 S.E. 2d 204 (1978). Defendant's evidence which clarifies the state's evidence or rebuts inferences favorable to the state may be considered favorably to defendant if it does not contradict and is not inconsistent with the state's evidence. *State v. Bates*, 309 N.C. 528, 308 S.E. 2d 528 (1983); *State v. Bruton*, 264 N.C. 488, 142 S.E. 2d 169 (1965). There must be substantial evidence of the facts sought to be proved. *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980). Substantial evidence is evidence from which any rational trier of fact could find the fact to be proved beyond a reasonable doubt. *State v. Pridgen*, 313 N.C. 80, 326 S.E. 2d 618 (1985); *State v. Jones*, 303 N.C. 500, 279 S.E. 2d 835 (1981). Evidence is not substantial if it arouses only a suspicion about the fact to be proved, even if the suspicion is strong. *State v. Malloy*, 309 N.C. 176, 305 S.E. 2d 718 (1983).

[5, 6] Applying this test to the evidence before us, we hold the evidence was sufficient to permit the jury to find beyond a reasonable doubt that Stokes himself delivered fatal blows to the victim. We note that it is not necessary under *Enmund* that a capital defendant in order to be executed be the only person who delivered fatal blows to the victim. It is enough if the capital defendant is one of two or more who delivered fatal blows. Here state's witness Thomas testified that Stokes armed with a stick and Murray armed with "some kind of object" accosted the victim, Lehto, for the purpose of robbing him on a ramp just outside the door to his warehouse. A struggle ensued during which Stokes was "bent over." Lehto, although seventy years old, was described as a "physically very active man." The struggle occurred at approximately 6:30 p.m. At approximately 8:30 p.m. Lehto was discovered, semiconscious, lying on the ramp where the attack occurred. He had gashes on his head and his skull had been crushed. He died some fourteen hours after the attack from head injuries. Clearly this evidence, taken in the light most favorable to the state, is enough for a rational jury to find beyond a reasonable doubt: Stokes and Murray in an effort to rob Lehto accosted him at his warehouse. Lehto put up a struggle. Stokes and Murray hit Lehto about the head to subdue him, Stokes with the stick and Murray with some other object they each had, respectively, carried to the scene. These blows to the head caused Lehto's death.

The trial judge, therefore, correctly denied defendant's motion for a directed verdict on the *Enmund* issue.

VI.

**[7]** Having found no error relating to conduct of the new sentencing hearing, we now consider whether the death sentence "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). We conclude that it is.

The Court has said:

> In essence, our task on proportionality review is to compare the case at bar with other cases in the pool which are roughly similar with regard to the crime and the defendant, such as, for example, the manner in which the crime was committed and defendant's character, background, and physical and mental condition. If, after making such a comparison, we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

*State v. Lawson*, 310 N.C. 632, 648, 314 S.E. 2d 493, 503 (1984), *cert. denied*, --- U.S. ---, 86 L.Ed. 2d 267 (1985). The pool of available cases from which those roughly similar with regard to the crime and defendant may be drawn for comparison purposes has been defined as

> *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*State v. Williams*, 308 N.C. at 79, 301 S.E. 2d at 355. The pool, however, includes only those cases which this Court has found to

be free of error in both phases of the trial. *State v. Jackson,* 309 N.C. 26, 45, 305 S.E. 2d 703, 717 (1983).

Proportionality review is intended to serve "as a check against the capricious or random imposition of the death penalty." *State v. Hutchins,* 303 N.C. 321, 357, 279 S.E. 2d 788, 810 (1981). By requiring this Court to compare penalties imposed in similar cases, the legislature has provided us with a mechanism for addressing and, insofar as we are able, eliminating disparities in capital sentencing that might occur because of, for example, improper racial, sexual, socioeconomic, or regional discrimination. *Cf. State v. Williams,* 304 N.C. 394, 410, 284 S.E. 2d 437, 448 (1981), *cert. denied,* 456 U.S. 932, 72 L.Ed. 2d 450 (1982) (one objective of state's capital sentencing statute is to eliminate effects of racial discrimination). Although comparative proportionality review is not always required by the federal Constitution, *Pulley v. Harris,* 465 U.S. 37, 79 L.Ed. 2d 29 (1984), it promotes consistency in capital sentencing.

In every proportionality review, this Court's emphasis is on an "independent consideration of the individual defendant and the nature of the crime or crimes which he has committed." *State v. Pinch,* 306 N.C. 1, 36, 292 S.E. 2d 203, 229, *cert. denied,* 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *rehearing denied,* 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983).

Here, the most similar case for comparison in terms of the crime committed is *State v. Murray,* 310 N.C. 541, 313 S.E. 2d 523 (1984), which arose out of the same incident as is now before us. Murray, like defendant Stokes, entered a plea of not guilty. The jury found him guilty, among other things, of first degree murder, and after the required hearing recommended that Murray be sentenced to life imprisonment. Judgment was entered accordingly.

The State's evidence in *Murray* tended to show, as it does here, that both Murray and Stokes struck the blows which resulted in the victim's death. Both carried sticks to the scene of the crime; both went up on the ramp leading to the warehouse door; both were seen engaged in a struggle with the victim. *Id.* at 544, 313 S.E. 2d at 526. The *Enmund* issue was answered against both

Murray[10] and Stokes. Thus, as to the crime committed, Murray and Stokes are equally culpable. Both committed the same crime in the same manner.

As for the defendants themselves, Stokes does not appear to be more deserving of death than Murray. Stokes was only seventeen years old when he murdered Kauno Lehto; Murray was considerably older.[11] There also is evidence that Stokes suffered from impaired capacity to appreciate the criminality of his conduct, and that he was under the influence of a mental or emotional disturbance at the time of the murder. Moreover, because the jury found the existence of "one or more" mitigating circumstances without specifying which ones, we must assume the existence of each mitigating factor the trial judge submitted and the evidence supported, including those involving age, mental or emotional disturbance, and impaired capacity. *State v. Lawson*, 310 N.C. at 648, 314 S.E. 2d at 503. None of these mitigating factors applied to Murray, who in addition had a worse criminal record than Stokes.[12]

The State, during oral argument, tried valiantly to distinguish this case from *Murray*. Counsel suggested, for example, that Stokes was the ringleader, and that he may have beaten the victim more savagely than did Murray.

There is simply no evidence in the record to support either contention. Lorenzo Thomas, the only eyewitness to testify at Stokes' trial, indicated that Stokes and Murray took equal parts in the beating of Kauno Lehto. Evidence of who was the ringleader is virtually nonexistent. Thomas testified that after the crime was completed Stokes gave him a bag of marijuana for act-

---

10. See Issues and Recommendations as to Punishment, File No. 82CRS10109, New Hanover Superior Court.

11. The evidence shows that in December 1981, when the crime was committed, Murray was in his twenties, "closer to 23 than . . . 20." Thomas was "approximately 23 [or] over 20." Benbow was "17 or 18."

12. Murray had been convicted of several violent assaults. One of these was felonious and resulted in a two-year prison sentence. *State v. Murray*, 310 N.C. 541, 549-50, 313 S.E. 2d 523, 529-30. The jury found as an aggravating factor that Murray had previously been convicted of a felony involving the use of violence to a person. Stokes, on the other hand, had a record consisting primarily of property offenses and one assault committed as a juvenile.

ing as a lookout. On the other hand, Thomas said it was Ricky Benbow who asked him to stand watch in the first place. Other facts culled from the testimony in this case are similarly inconclusive.

Justice Mitchell, in his dissent, argues that Stokes drove Lehto's car away from the crime scene, thereby removing the victim's last hope of obtaining help. The evidence on this point, though contradictory, tends to show that Murray and Benbow rode away with Stokes. Defendant, in his largely exculpatory pretrial statement, claimed to have driven away alone. Thomas, however, put Murray and Benbow in the car with Stokes. At Benbow's sentencing hearing the state *stipulated* that Stokes, Murray, and Benbow drove away together. *State v. Benbow*, 309 N.C. 538, 541, 308 S.E. 2d 647, 649 (1983). Murray, at his trial, was convicted of the felonious larceny of Lehto's car. *State v. Murray*, 310 N.C. at 547-49, 313 S.E. 2d at 528-29. Surely Stokes is not more deserving of death than Murray simply because he was behind the wheel of the car in which they both made their escape.

The dissent also makes much of Stokes' crime being found by the jury to have been "especially heinous, atrocious, or cruel."[13] The dissenters acknowledge, however, that juries do not consistently recommend the death sentence in cases involving especially heinous first degree murders. In fact, a review of the proportionality pool indicates that they have recommended life imprisonment more often than death in such cases.[14]

---

13. The jury in *Murray* did not answer the "especially heinous" issue, even though it was submitted. The jury did find, as aggravating circumstances, that Murray had previously been convicted of a felony involving the use of violence to the person, and that his murder of Lehto was committed for pecuniary gain. See Issues and Recommendations, *supra* note 10.

14. Juries have recommended life imprisonment despite finding the murder to be especially heinous in 20 cases involving 24 defendants. *State v. Barts*, 316 N.C. 666, 343 S.E. 2d 828 (1986); *State v. Sidden*, 315 N.C. 539, 340 S.E. 2d 340 (1986) (two defendants); *State v. Ledford*, 315 N.C. 599, 340 S.E. 2d 309 (1986); *State v. Hayes*, 314 N.C. 460, 334 S.E. 2d 741 (1985) (three defendants); *State v. Spangler*, 314 N.C. 374, 333 S.E. 2d 722 (1985); *State v. Harold*, 312 N.C. 787, 325 S.E. 2d 219 (1985); *State v. Bare*, 309 N.C. 122, 305 S.E. 2d 513 (1983); *State v. Fincher*, 309 N.C. 1, 305 S.E. 2d 685 (1983); *State v. Hill*, 308 N.C. 382, 302 S.E. 2d 202 (1983); *State v. Barnett*, 307 N.C. 608, 300 S.E. 2d 340 (1983); *State v. Davis*, 305 N.C. 400, 290 S.E. 2d 574 (1982); *State v. Temple*, 302 N.C. 1, 273 S.E. 2d 273 (1981); *State v. Clark*, 301 N.C. 176, 270 S.E. 2d 425 (1980); *State v. King*, 301 N.C. 186, 270 S.E. 2d

The dissenters nevertheless seem to be arguing that the death penalty cannot be disproportionate in a case where the jury has found a murder to be especially heinous, atrocious, or cruel. *State v. Bondurant*, 309 N.C. 674, 309 S.E. 2d 170 (1983), indicates otherwise. In that case, defendant's premeditated and deliberate murder of a drinking companion was found by the jury to have been especially heinous, atrocious, or cruel; this Court nevertheless overturned the death sentence on proportionality grounds after reviewing the mitigating circumstances surrounding defendant's crime. *Id.* at 692-95, 309 S.E. 2d at 181-83. Chief Justice Branch, writing for a unanimous Court, noted that "[i]n conducting our proportionality review, we will consider the totality of the

98 (1980); *State v. Myers*, 299 N.C. 671, 263 S.E. 2d 768 (1980); *State v. Powell*, 299 N.C. 95, 261 S.E. 2d 114 (1980); *State v. Ferdinando*, 298 N.C. 737, 260 S.E. 2d 423 (1979); *State v. Atkinson*, 298 N.C. 673, 259 S.E. 2d 858 (1979), *overruled on other grounds, State v. Jackson*, 302 N.C. 101, 273 S.E. 2d 666 (1981); *State v. Taylor*, 298 N.C. 405, 259 S.E. 2d 502 (1979); *State v. Crews*, 296 N.C. 607, 252 S.E. 2d 745 (1979) (two defendants).

In at least two cases where the murder was found to be especially heinous, the jury could not agree on a sentencing recommendation and life imprisonment was imposed. *State v. Jenkins*, 311 N.C. 194, 317 S.E. 2d 345 (1984); *State v. Easterling*, 300 N.C. 594, 268 S.E. 2d 800 (1980).

Juries have recommended the death penalty after finding the murder to be especially heinous in 16 cases involving 17 defendants. *State v. Gladden*, 315 N.C. 398, 340 S.E. 2d 673 (1986); *State v. Brown*, 315 N.C. 40, 337 S.E. 2d 808 (1985), *cert. denied*, --- U.S. ---, 90 L.Ed. 2d 733 (1986); *State v. Huffstetler*, 312 N.C. 92, 322 S.E. 2d 110 (1984), *cert. denied*, 471 U.S. 1009, 85 L.Ed. 2d 169 (1985); *State v. Boyd*, 311 N.C. 408, 319 S.E. 2d 189 (1984), *cert. denied*, 471 U.S. 1030, 85 L.Ed. 2d 324 (1985); *State v. Maynard*, 311 N.C. 1, 316 S.E. 2d 197, *cert. denied*, 469 U.S. 963, 83 L.Ed. 2d 299 (1984); *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983); *State v. Craig and Anthony*, 308 N.C. 446, 302 S.E. 2d 740, *cert. denied*, 464 U.S. 908, 78 L.Ed. 2d 247 (1983); *State v. Williams*, 308 N.C. 47, 301 S.E. 2d 335, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 177, *rehearing denied*, 464 U.S. 1004, 78 L.Ed. 2d 704 (1983); *State v. McDougall*, 308 N.C. 1, 301 S.E. 2d 308, *cert. denied*, 464 U.S. 865, 78 L.Ed. 2d 173 (1983); *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569, *cert. denied*, 459 U.S. 1080, 74 L.Ed. 2d 642 (1982); *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *rehearing denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983); *State v. Smith*, 305 N.C. 691, 292 S.E. 2d 264, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982); *State v. Rook*, 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied*, 455 U.S. 1038, 72 L.Ed. 2d 155 (1982); *State v. Martin*, 303 N.C. 246, 278 S.E. 2d 214, *cert. denied*, 454 U.S. 933, 70 L.Ed. 2d 240, *rehearing denied*, 454 U.S. 1117, 70 L.Ed. 2d 655 (1981); *State v. McDowell*, 301 N.C. 279, 271 S.E. 2d 286 (1980), *cert. denied*, 450 U.S. 1025, 68 L.Ed. 2d 220, *rehearing denied*, 451 U.S. 1012, 68 L.Ed. 2d 865 (1981); *State v. Barfield*, 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied*, 448 U.S. 907, 65 L.Ed. 2d 1137, *rehearing denied*, 448 U.S. 918, 65 L.Ed. 2d 1181 (1980).

circumstances presented in each individual case and the presence or absence of a particular factor will not necessarily be controlling." *Id.* at 694 n. 1, 309 S.E. 2d at 183 n. 1. If we were to make *any* aggravating circumstance conclusive as to proportionality, we would thwart the comparative review mandate of G.S. § 15A-2000 (d)(2). Indeed, a thorough comparative proportionality review is particularly important when, as here, the "especially heinous" aggravating circumstance is the only one found by the jury. As the most ambiguous of the statutory aggravating factors, it is the most susceptible to inconsistent application. *See* Rosen, *The "Especially Heinous" Aggravating Circumstance in Capital Cases — The Standardless Standard,* 64 N.C. L. Rev. 941 (1986).

Stokes was convicted of first degree murder on a felony murder theory. There is little, if any, evidence of a premeditated killing. In robbery murder cases where conviction rests solely on a felony murder theory, juries in this state almost invariably have recommended life imprisonment rather than death. *State v. Hayes,* 314 N.C. 460, 334 S.E. 2d 741 (1985); *State v. Wilson,* 313 N.C. 516, 330 S.E. 2d 450 (1985); *State v. Wilson,* 311 N.C. 117, 316 S.E. 2d 46 (1984); *State v. Bauguss,* 310 N.C. 259, 311 S.E. 2d 248, *cert. denied,* 469 U.S. 838, 83 L.Ed. 2d 76 (1984); *State v. Hill,* 308 N.C. 382, 302 S.E. 2d 202 (1983); *State v. Barnett,* 307 N.C. 608, 300 S.E. 2d 340 (1983); *State v. Booker,* 306 N.C. 302, 293 S.E. 2d 78 (1982); *State v. Miller,* 302 N.C. 572, 276 S.E. 2d 417 (1981); *State v. Smith,* 301 N.C. 695, 272 S.E. 2d 852 (1981); *State v. Moore,* 301 N.C. 262, 271 S.E. 2d 242 (1980); *State v. Atkinson,* 298 N.C. 673, 259 S.E. 2d 858 (1979), *overruled on other grounds, State v. Jackson,* 302 N.C. 101, 273 S.E. 2d 666 (1981). In four of these cases the jury found that the murder was especially heinous, atrocious, or cruel. *Hayes, Hill, Barnett,* and *Atkinson.*

Juries have recommended death in only four armed robbery cases where defendant was convicted of first degree murder solely on a theory of felony murder. *State v. Gardner,* 311 N.C. 489, 319 S.E. 2d 591 (1984), *cert. denied,* 469 U.S. 1230, 84 L.Ed. 2d 369 (1985); *State v. Oliver and Moore,* 309 N.C. 326, 307 S.E. 2d 304 (1983); *State v. Craig and Anthony,* 308 N.C. 446, 302 S.E. 2d 740, *cert. denied,* 464 U.S. 908, 78 L.Ed. 2d 247 (1983); *State v. Williams,* 305 N.C. 656, 292 S.E. 2d 243, *cert. denied,* 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *rehearing denied,* 459 U.S. 1189, 74

L.Ed. 2d 1031 (1983). All of these killings were considerably more aggravated than the one now before us.

In *Gardner* defendant was convicted of two first degree felony murders committed during the course of an armed robbery. The Court characterized the killings as "part of a violent course of conduct, . . . coldblooded, calculated, and senseless." *State v. Gardner*, 311 N.C. at 514, 319 S.E. 2d at 607. The jury found as an aggravating circumstance that the murder was part of a course of conduct that included the commission of a crime of violence against another person. The jury refused to find that defendant's capacity to appreciate the criminality of his conduct was impaired, and was not asked to consider whether defendant was laboring under any mental or emotional disturbance. As noted earlier, we must assume that Stokes suffered from both infirmities.

In *Oliver and Moore* there were again two first degree murders, this time committed during the armed robbery of a convenience store. Defendant Oliver's death sentence for the murder of a customer, Dayton Hodge, while Hodge, in the presence of his seven-year-old grandson, was putting gas in his truck, was affirmed on appeal. The jury found as aggravating circumstances that this murder was committed for pecuniary gain. The jury found no mitigating circumstances.

*Williams* involved two murders and two armed robberies committed during the same course of conduct. The jury found the course of conduct including violence to another person as an aggravating factor. There was no evidence that defendant in *Williams* suffered from an impaired capacity to appreciate the criminality of his conduct or from any emotional or mental disturbance.

Finally, *Craig and Anthony* involved a murder which the jury found not only to be especially heinous, but also to be part of a course of conduct in which crimes of violence were committed against other persons. There was no suggestion that defendants were laboring under an impaired capacity or a mental or emotional disturbance. The murder victim in *Craig and Anthony* was first stabbed by Craig as she begged him not to kill her. Craig handed the knife to an accomplice who stabbed the victim repeatedly in the abdomen. Defendant Anthony then took the knife and

State v. Stokes

stabbed the victim until death ensued. In all, the victim was stabbed thirty-seven times.

Prior to today, this Court has overturned death sentences on proportionality grounds five times. *State v. Rogers*, 316 N.C. 203, 341 S.E. 2d 713 (1986); *State v. Young*, 312 N.C. 669, 325 S.E. 2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E. 2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E. 2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E. 2d 703 (1983). Our decision in *Young* is particularly instructive here. Defendant in that case asked two friends, Jackson and Presnell, to accompany him to the home of J. O. Cooke for the purpose of killing Cooke and stealing his money. En route, defendant Young

> suggested that Jackson hold Cooke, defendant stab him, and Presnell "finish" him. When the men arrived at Cooke's house, Jackson knocked on the door and told Cooke that they wanted to buy liquor. Cooke let the men inside and went into the kitchen to get the liquor. When he returned with the vodka, defendant suddenly reached into his pants, pulled out a knife and stabbed Cooke twice in the chest. Cooke said "What are you doing?" and fell to the floor. Cooke was able to take the knife from his own chest, at which point defendant told Presnell to "finish him." Presnell stabbed the victim five or six times in the back.

*State v. Young*, 312 N.C. at 672, 325 S.E. 2d at 184.

The Court unanimously found Young's death sentence to be disproportionate when compared to the punishments assessed in similar cases. Among other things, the Court said that it was "convinced that defendant Young did not commit a crime as egregious as those committed by the defendants in *Gardner*, . . . *Oliver and Moore, Craig and Anthony*, and *Williams.*" *Id.* at 691, 325 S.E. 2d at 194. Certainly the crime commited by Stokes was no more egregious than the pre-planned, cold-blooded killing involved in *Young*.

Three of the other four cases in which the death penalty was found disproportionate—*Rogers, Hill*, and *Bondurant*—involved first degree murder convictions based on a theory of premeditation and deliberation. The evidence in this case shows that Stokes and his accomplices planned to rob Lehto, not to kill him. The

state sought and obtained the conviction of Stokes on a felony murder theory. While this fact alone is not conclusive, our comparison of this case with others in the pool indicates that Stokes' crime does not rise to the level of those for which we have approved sentences of death. Rather, it falls within the class of crimes for which juries generally have recommended life imprisonment.

To summarize: Defendant Stokes is no more deserving of death than his accomplice James Murray, who committed the same crime in the same manner; indeed he may be less deserving of death in view of the mitigating circumstances involved in this case. In addition, juries in this state almost always recommend life imprisonment when defendant's conviction in a robbery murder case rests solely on a felony murder theory. Defendant's crime in the case at bar was less aggravated than those involved in *Gardner, Oliver and Moore, Williams,* and *Craig and Anthony,* the four robbery murder cases in which juries have recommended the death penalty following a conviction based solely on a felony murder theory. Finally, Stokes' crime was similar to—and no worse than—the one involved in *Young,* a case in which this Court found the death penalty to be disproportionate.

For the foregoing reasons we conclude as a matter of law that the death sentence in this case is disproportionate within the meaning of N.C.G.S. § 15A-2000(d)(2). This Court therefore must, and we hereby do, vacate defendant's sentence of death and order instead that defendant be sentenced to imprisonment in the state's prison for the remainder of his natural life. Defendant is entitled to credit on his sentence for all days spent in confinement before the date of this judgment. The Clerk of Superior Court of New Hanover County shall issue a commitment accordingly.

Death sentence vacated.

Sentence of life imprisonment imposed.

Justice MITCHELL dissenting in part.

I respectfully dissent from that part of the decision of the majority vacating the sentence of death and sentencing the de-

fendant to imprisonment for life. Otherwise, I concur in the result reached by the majority.

In this case, the jury found as an aggravating circumstance that the murder committed by the defendant was an especially heinous, atrocious or cruel murder in the first degree. We have previously discussed the phrase "especially heinous, atrocious, or cruel" used in N.C.G.S. § 15A-2000(e)(9) as follows:

> Although every murder may be characterized as heinous, atrocious, and cruel, this aggravating factor is not to be applied in every first-degree murder case. The legislature specifically provided that this aggravating circumstance may be found only in cases in which the first-degree murder committed was *especially* heinous, *especially* atrocious, or *especially* cruel. N.C.G.S. § 15A-2000(e)(9). Therefore, a finding that this aggravating circumstance exists is permissible when the level of brutality involved exceeds that normally present in first-degree murder, *State v. Goodman*, 298 N.C. 1, 257 S.E. 2d 569 (1979), or when the first-degree murder in question was conscienceless, pitiless, or unnecessarily torturous to the victim. *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L.Ed. 2d 1031 (1983). We have also stated that this factor is appropriate when the killing demonstrates an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder. *State v. Stanley*, 310 N.C. 332, 312 S.E. 2d 393 (1984).

In *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983), we identified two types of murder as included in the category of murders which would warrant the submission of the especially heinous, atrocious, or cruel aggravating circumstance to the jury. One type involves killings which are physically agonizing for the victim or which were in some other way dehumanizing. The other type consists of those killings which are less violent, but involve the infliction of psychological torture, placing the victim in agony in his last moments, aware of, but helpless to prevent, impending death.

In determining whether the evidence is sufficient to support a finding of essential facts which would support a determination that a murder was 'especially heinous, atrocious, or

cruel,' the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *State v. Moose,* 310 N.C. 482, 313 S.E. 2d 507 (1984); *State v. Stanley,* 310 N.C. 332, 312 S.E. 2d 393 (1984).

*State v. Brown,* 315 N.C. 40, 65-66, 337 S.E. 2d 808, 826-27 (1985). Having so defined this aggravating factor, the majority's view that the jury properly determined that the murder here was an *especially* heinous, atrocious or cruel murder in the first degree but also that the death sentence recommended by the jury was disproportionate seems to me to be almost inherently self-contradictory. The result simply defies reason and common sense.

If we are to have a death penalty — and our legislature has dictated that we shall — it would seem to me that the one situation in which it would certainly be applied would be a case involving an *especially* heinous, atrocious or cruel *murder in the first degree.* If the death penalty is not to be applied in such cases, when if ever may it be applied properly?

When exercising the statutory duty of proportionality review imposed uniquely upon this Court, we must bear in mind that:

> In comparing 'similar cases' for purposes of proportionality review, we use as a pool for comparison purposes *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*State v. Williams,* 308 N.C. 47, 79, 301 S.E. 2d 335, 355, *cert. denied,* 464 U.S. 865, 78 L.Ed. 2d 177 (1983). The pool, however, includes only those cases which this Court has found to be free of error in both phases of the trial. *State v. Jackson,* 309 N.C. 26, 45, 305 S.E. 2d 703, 717 (1983).

A review of all cases forming the pool available for our proportionality review makes it clear that juries have recommended death sentences frequently in cases involving especially heinous, atrocious or cruel murders in the first degree. *E.g., State v. Glad-*

*den,* 315 N.C. 348, 340 S.E. 2d 673 (1986); *State v. Brown,* 315 N.C. 40, 337 S.E. 2d 808 (1985); *State v. Huffstetler,* 312 N.C. 92, 322 S.E. 2d 110 (1984); *State v. Boyd,* 311 N.C. 408, 319 S.E. 2d 189 (1984); *State v. Maynard,* 311 N.C. 1, 316 S.E. 2d 197 (1984); *State v. Craig and Anthony,* 308 N.C. 446, 302 S.E. 2d 740 (1983); *State v. McDougall,* 308 N.C. 1, 301 S.E. 2d 308 (1983); *State v. Williams,* 308 N.C. 47, 301 S.E. 2d 335 (1983); *State v. Pinch,* 306 N.C. 1, 292 S.E. 2d 203 (1982); *State v. Brown,* 306 N.C. 151, 293 S.E. 2d 569 (1982); *State v. Smith,* 305 N.C. 691, 292 S.E. 2d 264 (1982); *State v. Rook,* 304 N.C. 201, 283 S.E. 2d 732 (1981); *State v. Martin,* 303 N.C. 246, 278 S.E. 2d 214 (1981); *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979). The majority points out that in other cases juries have recommended life imprisonment despite having found that the first degree murder in question was especially heinous, atrocious or cruel. North Carolina juries simply have not "consistently" recommended either life or death sentences in such cases. *Cf. State v. Lawson,* 310 N.C. 632, 648, 314 S.E. 2d 493, 503 (1984) (discussing principles to be considered when juries have "consistently" been returning life sentences or death sentences in a particular type of case).

The fact that *some juries* act in a self-contradictory manner by recommending a life sentence in such cases, however, is of little relevance to the proper performance of proportionality review by *this Court.* The very reason for proportionality review by *this Court* is to reduce the number of inconsistent or inherently self-contradictory results in capital cases, not to introduce or compound such errors as the majority does here.

The majority's reliance upon *State v. Bondurant,* 309 N.C. 674, 309 S.E. 2d 170 (1983) is equally unpersuasive. We recognized there that the presence or absence of a particular factor is not necessarily controlling during our proportionality review. We specifically emphasized, however, that the fact situation before us in *Bondurant* was unique because: "In no other capital case among those in our proportionality pool did the defendant [as did Bondurant] express concern for the victim's life or remorse for his action by attempting to secure immediate medical attention for the deceased." *Id.* at 694, 309 S.E. 2d at 182-83. The evidence in the present case represents the opposite end of the spectrum, however, since it tends to show that the defendant Stokes took steps to insure that the victim would not receive any type of assistance.

Even if the "similar cases" used for purposes of proportionality review are limited—as the majority has tended to do—to those cases in which the first degree murder conviction arose from an armed robbery and rested solely upon a felony murder theory, I would conclude that the death penalty recommended by the jury here was not disproportionate. As the majority points out, this Court has affirmed the death penalty in at least four such cases. *State v. Gardner*, 311 N.C. 489, 319 S.E. 2d 591, *cert. denied*, 469 U.S. 1230, 84 L.Ed. 2d 369 (1985); *State v. Oliver*, 309 N.C. 326, 307 S.E. 2d 304 (1983); *State v. Craig and Anthony*, 308 N.C. 446, 302 S.E. 2d 740, *cert. denied*, 464 U.S. 908, 78 L.Ed. 2d 247 (1983); *State v. Williams*, 305 N.C. 656, 292 S.E. 2d 243, *cert. denied*, 459 U.S. 1056, 74 L.Ed. 2d 622 (1982). However, I do not agree with the statement of the majority that those four killings "were considerably more aggravated than the one now before us."

Here, unlike the situation in any of those four cases, the murder committed by the defendant is included in both types defined as "especially heinous, atrocious, or cruel" in *Brown*. 315 N.C. 40, 65-66, 337 S.E. 2d 808, 826-27. The murder committed in this case by Stokes was one of the first type described in *Brown* because it was extraordinarily "physically agonizing for the victim" and extraordinarily "dehumanizing." *Id*. It was one of the second type described in *Brown* because it resulted in "placing the victim in agony in his last moments, aware of, but helpless to prevent, impending death." *Id*.

After considering the evidence before it, the jury properly could have found—and during proportionality review, this Court must assume it did find—the following facts *inter alia*: Stokes and Murray beat the seventy-year-old victim Kuano A. Lehto on the head until a portion of his brain was visible and blood was gushing from his mouth. The victim was in excellent physical condition for his age, however, and he continued to attempt to arise from the pool of blood on the warehouse ramp. After Stokes took his share of the victim's money, Stokes *and Stokes alone* took the keys to the victim's car. He then drove it to another street where he left it abandoned. The evidence is contradictory as to whether Murray and Benbow rode in the car, but the uncontradicted evidence was that *only Stokes* actually *took* the car away and personally denied the victim its use.

By his action Stokes insured that his elderly victim's last hope of extricating himself from the horror he faced was removed. Even if Lehto was able to rise after Stokes finally left him to die alone, his only means of going for help had been taken from him by Stokes. The victim was left alone awaiting his impending death without hope. This obviously was extraordinarily "agonizing for the victim" and extraordinarily "dehumanizing." *State v. Brown*, 315 N.C. at 65-66, 337 S.E. 2d at 826-27. It is equally obvious that Stokes' action in removing the victim's last hope had the effect of "placing the victim in agony in his last moments [here hours], aware of but helpless to prevent, impending death." *Id.*

None of the four armed robbery first degree murder cases in which this Court has affirmed the death penalty involved a victim left helpless to linger and die alone in a remote place in such a dehumanizing and torturous manner. In each of those cases in which we found the death penalty proper — *Gardner, Oliver, Craig and Anthony*, and *Williams* — the victims were killed quickly, cleanly and with little psychological torture by comparison to the way in which Stokes left Lehto to die after removing his last chance for survival. In all of those cases except *Craig and Anthony*, the victims were shot and died almost instantly. Even in *Craig and Anthony*, the victim's suffering was not as prolonged as in this case. Although the victim there begged her two assailants not to kill her and was stabbed by them thirty-seven times, her period of terror and suffering was blessedly brief when compared to that inflicted upon this victim by *Stokes* when he left the dying victim attempting to rise from a pool of blood and removed the victim's car.

Even if the pool of *all* "similar cases" is abandoned completely *and improperly* and comparison is made only to the case against Murray, who with Stokes beat Lehto, I do not accept the view that the death penalty against Stokes must be found disproportionate. After the two men had beaten Lehto until his brain was visible and blood was gushing from his mouth as he lay prostrate before them attempting to rise, Murray did nothing further to add to the dehumanizing and psychologically torturous nature of his death. The jury clearly could properly have believed on the evidence before it, however, that *Stokes* took the victim's keys and drove his car away, thereby removing his last hope for sur-

vival and leaving him to die a lingering and painful death alone. Stokes did not take the car for hope of gain. Instead, *Stokes* simply moved it to another street some distance from where the victim lay injured and left it abandoned. This additional torture of the victim by *Stokes* was entirely sufficient to provide a principled and rational basis for the jury in his case to recommend death, even though the jury in Murray's case recommended that Murray be sentenced to life imprisonment. The majority has usurped the function of the jury in this regard and is simply wrong when it decides that Stokes and his accomplice Murray "committed the same crime in the same manner . . . ."

This case perhaps demonstrates that proportionality review results to a considerable extent in the substitution of this Court's view of the most desirable sentence to impose for that of the jury. *See generally, e.g.*, Rosen, *The "Especially Heinous" Aggravating Circumstance in Capital Cases—The Standardless Standard*, 64 N.C. L. Rev. 941 (1986). The majority in the present case states, for example, that: "There is little, if any, evidence of a premeditated killing." The jury, upon finding that Stokes took a club to the scene of the crime and literally beat the victim's brains out before robbing him, apparently felt that there was more than a little evidence of a premeditated killing. Under our system giving this Court the duty to conduct proportionality review, the view of the majority of this Court prevails over that of the jury as to what the evidence actually establishes in this regard.

Given the statutory provisions enacted for capital sentencing in North Carolina, the type of "proportionality review" conducted here by this Court is not required by the Constitution of the United States. *Pulley v. Harris*, 465 U.S. 37, 79 L.Ed. 2d 29 (1984). The inconsistency introduced into capital sentencing by this Court's proportionality review is exemplified by this and similar cases. This situation should lead our General Assembly to consider removing the heavy burden of proportionality review which it has chosen to place upon this Court solely by statute. The General Assembly is free to do so. *Id.*

Two juries now have recommended that the defendant Stokes receive a sentence of death. Accordingly, two Superior Court Judges, in compliance with the law of North Carolina and

their oaths of office, have sentenced him to death. Contrary to the view of the majority, I conclude that the sentence of death was entered properly in the present case and was proportionate.

For the foregoing reasons, I respectfully dissent from that part of the decision of the majority vacating the sentence of death and sentencing the defendant to imprisonment for life.

Justice WEBB joins in this dissenting opinion.